DIVAN BUILDERS, INC. A NEW JERSEY CORPORATION, PLAINTIFF-RESPONDENT, v. PLANNING BOARD OF THE TOWNSHIP OF WAYNE, *ET AL.*, DEFENDANTS-APPELLANTS.

Argued September 24, 1974—Decided March 13, 1975.

583

584

*Mr. Robert S. Moraff* argued the cause for appellants.

*Mr. Ronald B. Sokalski* argued the cause for respondent (*Messrs. Corrado, Corcoran & Sokalski,* attorneys; *Mr. Sokalski,* of counsel and on the brief).

The opinion of the Court was delivered by

PASHMAN, J. The principal question posed by this appeal is whether the Municipal Planning Act, *N. J. S. A.* 40:55-1.1 *et seq.* authorizes a municipality to enact an ordinance

which empowers the governing body or the Planning Board, if it has been authorized by ordinance to act on applications for subdivision approval "in lieu of the governing body," *N. J. S. A.* 40:55–1.14 to condition subdivision approval upon a developer's installation of off-site improvements. The trial court granted summary judgment for plaintiff, *Divan Builders, Inc. v. Wayne Planning Board,* 122 *N. J. Super.* 508 (Law Div. 1973), and the Appellate Division affirmed, *Divan Builders, Inc. v. Wayne Planning Board,* 127 *N. J. Super.* 368 (App. Div. 1974).[1] We granted defendants' petition for certification, 65 *N. J.* 283 (1974).

The facts were largely stipulated by the parties. Plaintiff Divan Builders, Inc. initially applied to the Wayne Township Planning Board for subdivision approval in late 1969. Divan's proposal contemplated the construction of 31 single family dwellings in a residential zone of the Township. Because a substantial portion of the building site was covered by a pond, the developer's plan called for its draining and the construction of a conduit which would pipe the water from its upstream source through the development and into an existing drainage facility on the downstream border of the site.

Despite some preliminary concern over the drainage problem associated with the proposed subdivision, the Township governing body granted preliminary subdivision approval on October 7, 1970 on the recommendation of the Planning Board. In January 1972 final subdivision approval was granted for five of the lots, and in May 1972, plaintiff applied for final approval of the remaining 26 lots.

On June 21, 1972, the Wayne governing body amended its subdivision ordinance by adopting Ordinance No. 69–1972. The ordinance establishes procedures to be followed when off-

---

[1] The Appellate Division denied defendants' petition for rehearing on February 28, 1974.

site improvements are deemed necessary to service a subdivision. The ordinance provides in part that:

> Prior to the granting of final approval of all subdivisions hereafter submitted to the Planning Board, and prior to the issuance of any building permits for any land use, including land uses which require site plan approval . . . and any residence or other use of property on an unimproved street or where any off-site improvements have not then been installed, the subdivider or other named type of applicant . . . shall have installed, posted a performance bond, or made cash payments, in the manner provided in Section 5 below, with respect to the immediate or ultimate installation of any required off-site improvements. [Ordinance No. 69–1972, § 14–26(a)].

Off-site improvements include the installation of new, or the extension or modification of existing improvements made necessary in whole or in part by the subdivision which will be benefited by the improvement.[2] The ordinance also provides that the cost of off-site improvements shall be allocated between the applicant, other property owners, or any one or more of them. The cost allocation is based upon such factors as the benefit conferred upon the subdivision, the cost of the improvement, and the extent to which the improvement is necessary to protect neighboring property under the proposed plan.

---

[2]The definitional sections of the ordinance, §§ 14–27(b)(1) and (2) provide in part that off-site improvements include any of the following:

(1) All improvements of the types described in Article 6A of this Chapter (14–26 Improvements) for on-site installation, where the need for the providing of such improvements off-site is in whole or in part made necessary by the proposed subdivision and where the making of such improvements will confer a benefit upon the lands which are the subject of the subdivision application.

(2) Any improvement or facility, the installation of which is required in the public interest and the public need for which would not arise but for the improvement of the lands which are the subject of the subdivision application and the installation of which will confer a benefit upon the lands which are the subject of the subdivision application.

On June 26, 1972, the Planning Board recommended final approval of plaintiff's remaining 26 lots subject to certain conditions, including the following:

[T]hat the applicant contribute to the Township of Wayne a sum of $20,000 as their share of improving the downstream conditions of the stream which carries the drainage from the subdivision.

In July 1972 plaintiff received final approval for the remaining portion of its subdivision on the condition that it pay the Township $20,000. This sum represented approximately 8% of the estimated $250,000 cost of the off-site improvement deemed necessary to serve the entire drainage basin. Only one other developer, however, was required to contribute a similar sum pursuant to the ordinance.[3]

The parties stipulated that: (1) the drainage system would accommodate the increased runoff from plaintiff's property as well as from neighboring properties and tracts located downstream in the drainage basin[4]; (2) the system would protect previously developed properties from floods which would otherwise result from the development of plaintiff's subdivision and other unimproved property as well[5]; (3) it

---

[3]The other contributing developer, Nassau Associates, is not a party to this litigation.

[4]One of the problems frequently associated with land development is the increased erosion potential which results when unimproved land is covered with impervious surfaces. The trial court explained the problem as follows:

The amount of rainfall absorbed by the land is reduced in proportion to the extent of structures, roads, driveways and other impervious surfaces which cover a development. As the surface outflow increases in amount and intensity by such construction, "flood" and "erosion" may menace the plots in the subdivision as well as lands of others located on its borders. Also, if downstream flow is obstructed by an inadequate exterior drainage system, the lots in the subdivision will be flooded in the back-up process. [*Divan*, *supra*, 122 *N. J. Super.* at 515].

[5]Despite the concession that developed properties would be protected from increased runoff due to the improvement of plaintiff's sub-

was the established policy of the municipality to impose a required contribution from the owner of each of the undeveloped tracts in the drainage basin pursuant to Ordinance No. 69 for his fair share of the improvement when the owners apply for subdivision approval, site plan approval, or a building permit.

On September 6, 1972, the Wayne governing body passed Ordinance No. 108–1972, a bond ordinance authorizing the construction of the drainage basin improvement project as a general improvement — no part of the cost of which "has been or shall be specially assessed on property specially benefited thereby" — and appropriating $250,000 for that purpose. To meet that appropriation, bonds totaling $238,050 were to be issued, the ordinance reciting that the remaining $11,950 ("down payment") was available from contributed funds and that it was estimated that a total of $40,000 of contributed funds would be received.

Shortly after the enactment of the bond ordinance, plaintiff instituted the present action to recover the $20,000 paid to the Township. On cross motions for summary judgment, the trial court upheld the right of municipalities to require protective drainage improvements to be constructed either on-site or off-site as a condition precedent to subdivision approval when the development will be fully integrated into the community at large. *Divan, supra,* 122 *N. J. Super.* at 515. The court nonetheless entered judgment for plaintiff because in its view, while the Township could compel the developer to pay for improvements made necessary to serve the subdivided plots, the developer could not be required to pay for improvements made necessary to accommodate adjoining areas. 122 *N. J. Super.* at 517–18. The court also

division, defendants contend that the already developed properties in the area will not be benefited by the new drainage system since the existing system has been adequate for their purposes. Plaintiffs, however, did not accept this assertion as part of the stipulation of facts.

considered the effect of the bond ordinance on the dispute and concluded that the adoption of the improvement ordinance enhanced plaintiff's right to recover since the balance of the general drainage improvement was to be paid from *ad valorem* taxes imposed on all taxable property within the Township, even though contributions toward the cost of the improvement would subsequently be required of other subdividers. 122 *N. J. Super.* at 520. Because the drainage project was undertaken as a general improvement, the court concluded that the off-site improvement ordinance could not be invoked to transform the project into an undertaking to be paid for by the subdividers. 122 *N. J. Super.* at 521.

The Appellate Division affirmed, essentially for the reasons set forth by the trial court, *Divan, supra,* 127 *N. J. Super.* at 368. Because the municipality conceded at oral argument that, as a result of the enactment of the general improvement ordinance, properties developed in the future and serviced by the drainage project may not be assessed a proportionate share of the cost, the Appellate Division concluded that only plaintiff and the other contributing developer will be required to pay any portion of the cost of the improvement. 127 *N. J. Super.* at 369–70. Since other undeveloped tracts will be equally benefited, the court found that the municipality had obviously discriminated against plaintiff. Because of this finding, the Appellate Division declined to consider the larger question of whether the Planning Act empowers municipalities to impose upon subdividers the requirement of installing or contributing to the cost of off-site improvements. 127 *N. J. Super.* at 370. We granted certification to consider the latter issue, a question referred to but left undecided in several of our prior opinions. *See, e. g., Colonial Oaks West, Inc. v. East Brunswick Tp.,* 61 *N. J.* 560 (1972); *Longridge Builders, Inc. v. Princeton Planning Board,* 52 *N. J.* 348 (1968); *Reid Development Corp. v. Parsippany- Troy Hills Tp.,* 10 *N. J.* 229 (1952).

## I

With the continuing development of large portions of our State, it is clear that municipalities have a significant interest in exercising reasonable controls over land subdivisions.[6] The results of failing to insure orderly development of land were summarized by the former Supreme Court in deciding *Mansfield & Swett, Inc. v. West Orange,* 120 *N. J. L.* 145 (Sup. Ct. 1938), an early leading case in the field of municipal planning.

> We are surrounded with the problems of planless growth. The baneful consequences of haphazard development are everywhere apparent. There are evils affecting the health, safety and prosperity of our citizens that are well-nigh insurmountable because of the prohibitive corrective cost. To challenge the power to give proper direction to community growth and development in the particulars mentioned is to deny the vitality of a principle that has brought men together in organized society for their mutual advantage. [120 *N. J. L.* at 150-51].

Although these observations were made over 35 years ago, the current condition of many of our urban areas gives them a prophetic ring.

---

[6]Indeed, one textwriter has suggested that the interests served by responsible subdivision control are several:

> The establishment of reasonable regulations for control of land subdivisions assures to the greatest degree possible the method whereby vacant land forming part of the community can be developed for its best and highest use, in a manner compatible with the balance of the community, with all necessary protection against deterioration, and which will safeguard the interests of the purchaser of a lot therein, the subdivider, the financing agency and the municipality, each of whom is interested in protecting value. The homeowner is interested in protecting the value of his investment, now and in the future, as is his mortgagee; the subdivider is, or should be, interested in protecting the value of his as yet unsold land, and of further outlying lands which afford scope for further, future subdivision; the local government is interested in protecting ratables for taxation now and in the future, and in establishing definite, minimum costs with respect to the area of land involved.

[3 *Rathkopf, Zoning and Planning* (3 ed. 1972), § 2 at 71-8].

 Despite the substantial interest which municipalities have in insuring orderly community development, it is fundamental that subdivision controls can only be exercised by virtue of appropriate enabling legislation, *Kligman v. Lautman, 53 N. J. 517, 536* (1969). *See also Levin v. Livingston Twp., 35 N. J. 500, 507–508* (1961). Consequently, the question of whether a municipality possesses particular powers in the subdivsion approval context must necessarily begin with a consideration of the Municipal Planning Act, *N. J. S. A.* 40:55–1.1 *et seq.*

The Municipal Planning Act of 1953 was enacted to empower municpalities to adopt "comprehensive regulatory standards which would facilitate sound and orderly future municipal growth," *Lake Intervale Homes, Inc. v. Parsippany-Troy Hills, 28 N. J. 423, 435* (1958). To achieve orderly community development, the act authorizes municipalities to regulate the subdivision[7] of land within its borders. *N. J. S. A.* 40:55–1.14 to 1.29. Central to the legislative framework for subdivision control is the approval requirement authorized by *N. J. S. A.* 40:55–1.14, either by the planning board alone or by the municipal governing body acting on planning board approval. *Levin, supra, 35 N. J.* at 508.

As a necessary adjunct to the approval requirement, the Act empowers the municipality to impose two broad cate-

---

[7]The Act defines the term subdivision as follows:

"Subdivision" means the division of a lot, tract, or parcel of land into two or more lots, sites or other divisions of land for the purpose, whether immediate or future, of sale or building development; except that the following divisions shall not be considered subdivisions within the meaning of this act; *provided, however,* that no new streets or roads are involved; divisions of land for agricultural purposes where the resulting parcels are three acres or larger in size, divisions of property by testamentary or intestate provisions, or divisions of property upon court order. Subdivision also includes resubdivision, and where appropriate to the context, relates to the process of subdividing or to the lands or territory divided. [*N. J. S. A.* 40:55–1.2].

gories of improvements upon developers as conditions precedent to subdivision approval. The first category which is set forth in *N. J. S. A.* 40:55–1.20, is general and requires the municipality to consider the broad aspects of the proposed subdivision. After specifically mentioning drainage and street design and location, the section provides:

> The planning agency shall further require that all lots shown on the plats shall be adaptable for the intended purposes without danger to health or peril from flood, fire, erosion, or other menace. [*N. J. S. A.* 40:55–1.20].

We have previously described this section as one which is "mandatory, is broad and relates to layout, design and other basic general terms and conditions." *Levin, supra,* at 508–09.[8]

. The second improvement section contained in the Act is much more specific, and empowers the governing body to impose by ordinance particular improvements as conditions to subdivision approval. These improvements may be "above and beyond the general terms and conditions" established by *N. J. S. A.* 40:55–1.20, *Levin, supra,* at 509. Authority to impose the latter category of improvements is contained in *N. J. S. A.* 40:55–1.21 (Supp. 1974–75) which provides in part:

> Before final approval of plats the governing body may require, in accordance with the standards adopted by ordinance, the installation, or the furnishing of a performance guarantee in lieu thereof, of any or all of the following improvements it may deem to be necessary or appropriate: street grading, pavement, gutters, curbs, sidewalks, street lighting, shade trees, surveyor's monuments, water mains, culverts, storm sewers, sanitary sewers or other means of sewage dis-

---

[8]See also *Ardolino v. Florham Park Bd. of Adjustment,* 24 *N. J.* 94, 110 (1957), where we said with reference to this section:

It is the obvious intent of the act that in matters requiring the approval of the planning board it should have authority to impose those conditions which in the circumstances it believes are reasonably necessary for the protection of the public good and welfare.

posal, *drainage structures, and such other subdivision improvements as the municipal governing body may find necessary in the public interest.* [Emphasis supplied].

■ It is clear from the foregoing that a municipality may condition subdivision approval upon the developer's installation of those improvements which the local governing body finds necessary for the protection of the public interest. The problem, of course, is that the statutory scheme makes no specific reference to off-site improvements in this context.

■ In our view, however, this omission does not preclude a determination that the Planning Act authorizes municipalities to adopt both on-site and off-site improvement ordinances. Several different considerations have led us to this conclusion.

■ In general, our constitution requires a liberal construction of any law which concerns a municipal corporation. *N. J. Const.* (1947), Art. IV, § VII, ¶ 11 provides that:

The provisions of this Constitution and of any law concerning municipal corporations formed for local government, or concerning counties, shall be liberally construed in their favor. The powers of counties and such municipal corporations, shall include not only those granted in express terms but also those of necessary or fair implication, or incident to the powers expressly conferred, or essential thereto, and not inconsistent with or prohibited by this Constitution or by law.

While the constitutional mandate applies to all grants of power to municipalities and counties, the Legislature has also manifested its intent that the Planning Act in particular is to receive a broad construction. *N. J. S. A.* 40: 55–1.3 provides in part:

This act shall be construed most favorably to municipalities, its intention being to give all municipalities the fullest and most complete powers possible concerning the subject matter hereof. * * *.

We have previously had occasion to consider this provision and have concluded that:

Questions of interpretation and construction must therefore be re-solved in favor of governmental authority, when reasonably possible to do so, for the maximum protection of the primary public interest, as well as incidentally for the benefit of the individuals who become the ultimate owners of the subdivider's final product. [*Levin, supra,* at 507],

In our judgment, the constitutional and legislative direction to resolve questions of municipal authority broadly in favor of the local unit, compels the conclusion that, by necessary implication, *N. J. S. A.* 40:55–1.21 empowers a planning agency to require both on-site and off-site improvements of the physical character and type referred to in *N. J. S. A.* 40:55–1.20 and *N. J. S. A.* 40:55–1.21, including off-site improvements made necessary by reason of the subdivision's effect on lands other than the subdivision property, provided that the agency acts pursuant to a valid local ordinance containing suitable standards governing construction and installation of improvements. See *Deerfield Estates v. Twp. of East Brunswick,* 60 *N. J.* 115 (1972).

There are, however, other considerations which lead us to this result. In commenting on *N. J. S. A.* 40:55–1.21, Professor Cunningham has observed that:

All the enumerated improvements seem to be reasonably related to the public health, safety and general welfare and thus within the state's public power. * * * It seems clear that the cost of such improvements is a legitimate expense of subdividing which ought to be borne in the first instance by the developer and ultimately, in most cases, by the purchasers of lots in the subdivision who benefit directly from the improvements. [Cunningham, "Control of Land Use in New Jersey under the 1953 Planning Statutes," 15 *Rutgers L. Rev.* 1, 42 (1960) (footnotes omitted)].

These observations have already been referred to with approval by this Court in the on-site improvement context, *Levin, supra,* 35 *N. J.* at 514. We believe, however, that these considerations are equally relevant when the municipality seeks to require off-site improvements prior to subdivision approval. The public interest is no less substantial in

the latter context since in either case the alternative to developer installation of the required improvements is municipal construction at public expense. We are satisfied that the inclusion of off-site improvements in the authority granted by *N. J. S. A.* 40:55-1.21 comports with the overall legislative purpose to require developers in the first instance to assume the legitimate expenses of subdivision.[9]

Finally, our recognition that *N. J. S. A.* 40:55-1.21 authorizes municipalities to enact off-site improvement ordinances is a logical consequence of prior case law dealing with the problem. In *Lake Intervale Homes, Inc., supra,* for example, plaintiff developer purchased 30 lots in a larger tract containing over 300 building lots. Eighteen of plaintiff's lots were contiguous, but the remaining twelve were scattered throughout the development in pairs, on various unimproved streets. After commencing construction on several houses, the developer requested an extension of the water mains to service his lots. The municipality refused and countered by conditioning further building permits on the submission of the developer's plat for approval pursuant to the subdivision ordinance. The municipality's primary purpose in demanding plat approval was to impose the obligation of installing the water mains on the developer. This was a particularly harsh requirement due to the location of the developer's lots. In some instances, extensions along an entire street were necessary in order to accommodate a single house on the block.

In the ensuing litigation, it was the Township's position that the Planning Act provided it with authority to impose the cost of the water mains on the developer. In deciding the case, however, the Court declined to consider the basic

---

[9]*See Pennyton Homes, Inc. v. Stanhope Planning Board,* 41 *N. J.* 578, 582 (1964) where the Court, in commenting upon the subdivision control provisions of the Planning Act, stated that "the evident legislative intent . . . [is] the primacy of the public interest." *See also Hilton Acres v. Klein,* 35 *N. J.* 570, 579 (1961).

question of whether the water main extensions were a permissible exaction pursuant to *N. J. S. A.* 40:55–1.21, but instead focused upon the requirement for standards in an improvement ordinance. Since the municipal ordinance was devoid of standards relating to the imposition of costs and purported to impose the total cost of improvements upon the subdividers, the Court found the ordinance to be completely arbitrary and discriminatory in its application to the instant facts. *Lake Intervale Homes, Inc. v. Parsippany-Troy Hills, supra,* 28 *N. J.* at 441.

Perhaps the most significant signpost in the development of this aspect of planning law was this Court's decision in *Longridge Builders, Inc. v. Princeton Planning Board,* 52 *N. J.* 348 (1968). The Princeton Township Planning Board had required plaintiff to pave a dedicated but unimproved road extending from the northern boundary of the subdivision 361 feet to an existing right-of-way. When plaintiff challenged the imposition of this condition, both the trial court and the Appellate Division held that the Planning Board had no power under the Planning Act to require off-site improvements. *Longridge, supra,* at 349. On appeal to this Court, we specifically reserved decision on the broader question and based our affirmance on the absence of suitable cost apportionment standards in the Princeton ordinance. With specific reference to *Lake Intervale Homes, Inc., supra,* we found that it was impermissible to saddle the developer with the entire cost of the improvement when other property owners would also benefit from it. 52 *N. J.* at 350.

The plain implication of the cases, Longridge in particular[10], is that an off-site improvement ordinance is permissible under our Planning Act provided that the measure contains suitable standards to govern cost allocation.

---

[10]Later decisions of this Court have also recognized this implication. *See Brazer v. Borough of Mountainside,* 55 *N. J.* 456, 465–66 (1970).

## II

We have heretofore recognized that a municipality may utilize three principal ways to finance an off-site improvement. In *Deerfield Estates, supra,* the defendant municipality refused to install water mains to serve plaintiff's lots. As a threshold question, the Court held that a municipality which had created a planning board and adopted an adequate subdivision ordinance could validly condition subdivision approval upon installation of necessary water mains. 60 *N. J.* 122.

Proceeding to the question of financing the water main extension, Justice Mountain set forth three principal ways in which the municipality could defray the cost of the improvements:

First, it may be undertaken entirely at municipal cost and expense. * * * In the second place the municipality may undertake the project as a local improvement and assess the cost against the owners of the properties benefited pursuant to the procedure outlined in *N. J. S. A.* 40:56-1, *et seq.*

The third course is to require that the work be done at the expense of the developer either with or without a formula providing for partial or total reimbursement. Recourse to this third alternative, as to which there has hitherto existed some question, may be had only where appropriate local legislation permits the imposition and when it is fair and equitable that this be done. [60 *N. J.* at 131; footnote omitted].

Of course, the end result of either the second or the third approach is the placement of the ultimate cost of the improvement upon the owners or purchasers of the property benefited:

The second alternative does this directly; the third will normally have the same result since the developer will include the expense as an item in fixing his selling price. [60 *N. J.* at 132].

Thus, it is clear that in apportioning the cost of improvements in this context the municipality enjoys a degree of flexibility. The fundamental requirement, however, is that the end result must be equitable.

■ Although by its terms *N. J. S. A.* 40:55–1.21 only provides that the planning agency can require the developer to "install" required improvements or furnish "a performance guarantee in lieu thereof," we have recently observed that "[i]t is now settled as a general proposition that the expense of installing most required improvements may be imposed upon the developer." *Deerfield Estates v. Tp. of East Brunswick,* 60 *N. J.* 115, 124 (1972). *See also, Hilton Acres v. Klein,* 35 *N. J.* 570, 580 (1961); *Levin, supra,* 35 *N. J.* at 514–15. Recognition of this principle, however, is only a preliminary step in determining in the off-site context whether a particular cost allocation is permissible when the required improvement not only benefits the subdivider's tract but other properties as well. (No allocation problem is presented if the off-site improvement benefits only the subdivider's tract; the entire cost thereof may then be imposed on the subdivider.)

In striking down the planning board's attempt to require the developer in *Longridge* to pave an off-site right-of-way, we said:

It is clear to us that, assuming off-site improvements could be required of a subdivider, the subdivider could be compelled only to bear that portion of the cost which bears a rational nexus to the needs created by and benefits conferred upon, the subdivision. It would be impermissible to saddle the developer with the full cost where other property owners receive a special benefit from the improvement. [52 *N. J.* at 350].

The reason for the nexus requirement is clear. As we said in *Brazer v. Borough of Mountainside,* 55 *N. J.* 456 (1970), with specific reference to *Longridge,* "[b]eyond that, Planning Board impositions, although purportedly authorized by the Planning Act or the local ordinance, amount to impermissible exactions." [55 *N. J.* at 466].

■ As *Longridge* indicates, the portion of the cost which the subdivider may be compelled to bear is not limited to the special or peculiar benefit — a term referred to in *N. J. S. A.* 40:56–27 and interpreted in a number of cases includ-

ing *Ridgewood Country Club v. Borough of Paramus,* 55 *N. J.* 62, 68 (1969) — which the subdivided property receives by reason of the improvement. Consideration may also be given to the fact that the need for the off-site improvement was created by the proposed subdivision. *Cf. City of Buena Park v. Boyar,* 186 Cal. App. 2d 61, 8 *Cal. Rptr.* 674 (D. C. App. 1960).

Because the need for the off-site improvement was so created, the municipality in recognition of that fact may, in any event, fairly and properly call upon the subdivider to pay the difference between the cost of the improvement and the total amount by which all properties served thereby, including the subdivision, have been specially benefited by the improvement.

Further, but only if the off-site improvement *is* to be constructed as a "local improvement," *N. J. S. A.* 40:56-1 *et seq.,* with all properties specially benefited thereby to be assessed for the amount of special benefits accruing to each — the subdivider may be called upon to pay in addition to the amount above set forth the amount by which the subdivision property was specially benefited by the improvement.

If the off-site improvement is to be constructed by the municipality as a general improvement — no part of the cost of which may be specially assessed on properties specially benefited thereby — or if the off-site improvement is to be constructed by the subdivider with a provision for later reimbursement by the municipality, then the subdivider may not be charged with the amount by which the subdivision property was specially benefited. To do so would result in patent discrimination in the treatment afforded the subdivision property as contrasted with the other properties specially benefited by the improvement. *Cf. River Edge Homes v. Bor. of River Edge,* 130 *N. J. L.* 376 (Sup. Ct. 1943).

We pass now from the question of cost allocation to a consideration of how provision therefor may be made at the

time subdivision approval is granted, a date antecedent to the actual construction of the improvement.

 It is at once apparent that before the stated conditions are actually imposed on the applicant for subdivision approval, the governing body must decide whether the off-site improvement is to be constructed (1) by the municipality as a general improvement or (2) as a local improvement or (3) whether it is to be done by the developer with a formula providing for partial reimbursement if the improvement specially benefits properties other than the subdivision.

Once that decision has been made, the planning agency should be required to estimate, with the aid of the municipal engineer and such other persons having pertinent information or expertise (a) the cost of the improvement and (b) the amount by which all properties to be serviced thereby, including the subdivision property, will be specially benefited therefrom.

 When that has been determined, the subdivider may be required to provide, as a condition for approval of his subdivision application, a bond (or a cash deposit, in lieu thereof) to insure payment to the municipality of one of the following amounts:

(a) If the improvement is to be constructed by the municipality as a general improvement, an amount equal to the difference between the estimated cost of the improvement and the estimated total amount by which all properties to be serviced thereby, including the subdivision property, will be specially benefited by the improvement;

(b) If the improvement is to be constructed by the municipality as a local improvement, then in addition to the amount referred to in (a) the estimated amount by which the subdivision property will be specially benefited by the improvement; or

(c) If the improvement is to be constructed by the subdivider, an amount equal to the estimated cost of the improvement.

If the subdivider should deem that any of the amounts so estimated by the planning agency are unreasonable, it may challenge them and seek to have them revised in appropriate proceedings brought to compel subdivision approval.

Further, since the amounts are only estimated amounts, they should be redetermined once the improvement is completed to the end that the subdivider will be required to pay his appropriate and only his appropriate share of the cost thereof. If the municipality and the subdivider cannot agree with respect thereto, the dispute will have to be decided in a judicial proceeding or proceedings. If the improvement is constructed as a local improvement and the subdivider disputes the determination made by the officer or board charged with the duty of making assessments, see *N. J. S. A.* 40:56–23, as to the special benefit, *N. J. S. A.* 40:56–27, received by the subdivision property by reason of the improvement, its remedy with respect thereto will be the appeal procedure set out in the local improvement statute, *N. J. S. A.* 40:56–54 and 55.

It is evident that neither Ordinance 69–1972 nor the action taken by the municipality here conformed to the controlling principles herein set forth. Further, it *prima facie* appears — although defendants deny it — that there has been a disregard of the fundamental principle prohibiting discrimination in cost apportionment in requiring plaintiff to pay $20,000 and allocating no part of the cost to the other properties allegedly specially benefited by improvement, which was constructed as a general improvement.

Nevertheless, the payment was made and final subdivision approval was obtained by plaintiff without challenge to the sufficiency of the standards contained in the ordinance and the payment as well as the other costs and expenses involved in procuring subdivision approval were passed on to the purchaser of the subdivided property. In those circumstances, we are of the view that while plaintiff should be entitled to recover, as a payment made under duress, *cf. West Park Avenue, Inc. v. Twp. of Ocean,* 48 *N. J.* 122 (1966),

so much of the $20,000 it paid as exceeds the portion of the cost of the improvement fairly allocable to it, it may not recover more.

To that end, since the improvement was constructed by the municipality as a general improvement, the judgment is reversed and the cause remanded to the trial court for a determination at a trial, following appropriate discovery proceedings and a pretrial conference, of the difference between the cost of the improvement and the total amount by which all properties served thereby were specially benefited therefrom. That difference is fairly chargeable, under the circumstances indicated by the record, in equal shares to plaintiff and the other developer who made a $20,000 payment since their subdivisions created the need for the off-site improvement. Plaintiff will then be entitled to recover from the municipality only that portion, if any, of the $20,000 it paid which exceeds the amount fairly chargeable to it.

Reversed and remanded.

*For reversal and remandment*—Chief Justice HUGHES, Justices JACOBS, HALL, SULLIVAN, PASHMAN and CLIFFORD and Judge KOLOVSKY—7.

*For affirmance*—None.