# IN THE SUPREME COURT OF IOWA

No. 08–0563

Filed August 26, 2011

**SHARON K. NELSON; G. JEAN CONNELLY; JOHN P. RUSINACK** and **BEVERLY A. RUSINACK,** Husband and Wife; and **LOIS JOHNSON,**

Appellants,

vs.

**CITY OF HAMPTON, IOWA,**

Appellee.

Appeal from the Iowa District Court for Franklin County, Bryan H. McKinley, Judge.

Landowners appeal from district court decision denying their challenge to special assessments against their property for public improvements made by a city to a residential subdivision. **AFFIRMED.**

Raymond P. Drew, Hampton, for appellants.

James R. Wainwright of Ahlers & Cooney, P.C., Des Moines, for appellee.

**CADY, Chief Justice.**

In this appeal, we must primarily decide whether a city council's decision to make public improvements within a subdivision renders the city unable to assess the costs of the improvements to landowners when a city ordinance provides for the improvements to be made by the subdivider.[1]  The district court determined the city failed to enforce a subdivision ordinance requiring the subdivider to pay for street improvements, but concluded the plaintiffs failed to state a claim upon which relief could be granted because a city cannot be sued for its failure to enforce ordinances.  The district court further found the assessments were not excessive.  On our review of the issues presented on appeal, we affirm the decision of the district court.

## I.  Background Facts and Proceedings.

Nearly twenty years ago, Arthur Raisch and landowners in the northwest edge of the City of Hampton, Iowa, began to develop plans for a high-end residential housing project.  The basic plan eventually developed into three separate subdivisions, each connected by streets dedicated within each subdivision.  These streets were accessed from the northern end of Third Street Northwest.  Although this litigation primarily centers on the third subdivision, the other two phases are relevant to understanding the legal issues presented in this case.[2]

The first subdivision was located directly north of Third Street Northwest.  It is known as Oak Hill First Addition.  The preliminary plat

---

[1]Although the terms "subdivider" and "developer" are often used synonymously, in this case, the words refer to distinct roles.  The term "subdivider" is defined in the Hampton ordinance as "any person, firm, corporation, or legal entity undertaking the subdivision or resubdivision of a tract or parcel of land."  Hampton, Iowa, Code § 170.04(18) (2002).  The term "developer" is defined as "the owner of land proposed to be subdivided or the owner's agent."  *Id.* § 170.04(8).

[2]A map of the plat at issue in this case appears at the end of this opinion.

provided for the dedication of a street and cul-de-sac identified as Oak Court, which extended north off Third Street Northwest. Twelve lots abutted the cul-de-sac and street. The plat also called for the dedication of an east/west street called Oak Hill Drive that would intersect Oak Court. Oak Hill Drive would run east from Oak Court approximately 300′ into a cul-de-sac to provide access to the second subdivision immediately east of Oak Hill First Addition. This subdivision would consist of six lots and would be known as the Gallogly Subdivision.

The plans also called for Oak Hill Drive to run west of Oak Court to a cul-de-sac and would provide access to the third subdivision. This subdivision would be known as Oak Hill Second Addition. Ultimately, this third housing development would be separated from the Oak Hill First Addition by approximately 300′ of land owned by Raisch and other persons. Raisch, the primary developer, had preliminarily platted this area to be part of this subdivision, but eventually decided to limit the Oak Hill Second Addition to the west half of the land. Raisch had acquired ownership of the land over which Oak Hill Drive would extend from Oak Hill First Addition to Oak Hill Second Addition. Oak Hill Drive would then extend approximately 400′ within the subdivision containing ten abutting lots.

The Oak Hill First Addition was developed first, followed by the Gallogly Subdivision. Final plats were filed for both subdivisions, and the streets and municipal service lines were installed during the same time that the lots were sold and homes were built on the lots. The plans to develop Oak Hill Second Addition did not proceed forward, and the land to the west of Oak Hill First Addition remained largely undeveloped.

The first three lots on the west side of Oak Court in the Oak Hill First Addition, beginning at the southern portion of the point where

Northwest Third Street enters the subdivision, are identified as "lots one, two, and twelve." A sixty-six-foot strip of land between lots two and twelve was dedicated as the beginning of the street that would extend westerly from Oak Court into Oak Hill Second Addition to complete Oak Hill Drive. Plaintiffs John P. Rusinack and Beverly A. Rusinack purchased lot one in 1992. A house was erected on the lot at the time. Plaintiff Lois Johnson purchased lot twelve in 1993 with her late husband. The Johnsons built a home on the lot. Plaintiff G. Jean Connelly purchased lot two in 1998, together with her husband, who is now deceased. A house was erected on the lot at the time of the purchase. The land dedicated as the street between the Johnson and Connelly lots consisted of dirt and gravel.

The Rusinacks also purchased a tract of land immediately to the west of lot one. A portion of the northern boundary of the tract fronts the planned future development of Oak Hill Drive running into the Oak Hill Second Addition. The Johnsons also purchased a tract of land immediately to the west of lot twelve. The southern border of the tract fronts the planned development of Oak Hill Drive.

Plaintiff Sharon Nelson owns approximately three acres of land to the west of the second Rusinack lot. The land is rectangular in shape. The border to the north is 100′ and runs along the planned future development of Oak Hill Drive. The lot extends 650′ to the south. A house is located on the southern end of the lot, which fronts another street south of the development that runs east and west. Nelson and her husband had lived on the acreage for some time and used the northern border of their land as pasture for horses for many years.

The land between Oak Hill First Addition and Oak Hill Second Addition had been preliminarily platted by Raisch for development.

However, Raisch decided he did not want to include the land in the development of Oak Hill Second Addition. In April 2000, Raisch entered into a written development agreement with the City of Hampton in conjunction with his decision to proceed with the development of Oak Hill Second Addition. Under the agreement, Raisch agreed to employ an engineer to survey the property and proceed with the residential housing development. In return, the city agreed to make certain improvements to the property. In particular, Raisch agreed to dedicate the land to extend Oak Hill Drive 300′ from the west edge of Oak Hill First Addition to the Oak Hill Second Addition, and the city agreed to install the water main within the three-hundred-foot section. Raisch, however, agreed to compensate the city for the construction cost. Raisch agreed to engineer and install the sewer and water mains within Oak Hill Second Addition and connect them to the water and sewer mains extended by the city to the subdivision. The city agreed to furnish the pipes and materials to Raisch for the installation of the sewer and water mains within the subdivision. Additionally, Raisch agreed to install the storm sewers along the entire street extending west from the Oak Hill First Addition. He also agreed to be responsible for grading the entire street. Finally, the city agreed to surface the entire street and assess the cost to the adjoining property owners. This agreement was approved by the city council.

In 2001, Raisch hired a civil engineering firm to survey and subdivide the land as well as prepare the preliminary and final plats for the Oak Hill Second Addition. The engineering company understood the subdivision would be separated from Oak Hill First Addition by 300′, and that Oak Hill Drive would be extended from Oak Hill First Addition across the undeveloped land into the new subdivision.

The plans and plats for Oak Hill Second Addition were completed in 2002, and the project began in 2003 with the installation of sewer and water mains along Oak Hill Drive running west to the cul-de-sac. The street was also graded, leaving a dirt surface from Oak Hill First Addition. The city chose not to pave the street and not to install curbs, gutters, and the remaining storm sewer until the lots began to sell and homes were built.

The final plat of Oak Hill Second Addition was approved by the city council and recorded in June 2004. This plat consisted of nine lots abutting the street and cul-de-sac designated as Oak Hill Drive. The street then extended east from the lots to the land dedicated as the street between lot two and lot twelve of Oak Hill First Addition.

By 2005, over half the lots in the subdivision had sold, and the owners were experiencing some problems with the dirt surface street, as well as experiencing problems with surface drainage. The city decided to proceed with plans to surface the street. Raisch had passed away by this time, and the subdivision project had slowed. The city, however, continued to move ahead with the project. It hired the same engineering company that had surveyed the land and prepared the plat for Raisch to prepare the preliminary and final assessments for the street resurfacing project.

In November 2006, the city council adopted a resolution of necessity for the Oak Hill Drive improvements. The street improvements essentially consisted of the installation of 325′ of storm sewer and 905′ of six-inch concrete paving with integral curb and gutter. The surfacing would begin at Oak Court in the Oak Hill First Addition and run west into the cul-de-sac in the Oak Hill Second Addition.

The costs of the project in 2006 were estimated to be $183,100. An assessment plat and schedule were prepared. The city intended to assess 89.6% of the costs of the project to the owners of the lots and tracts abutting the improved street, pursuant to the special benefits derived from the improvements. The assessments were described in a preliminary assessment plat and schedule. A total of eighteen parcels of land abutting Oak Hill Drive were subject to the assessment. The property included the nine lots within the Oak Hill Second Addition, the two lots within Oak Hill First Addition, and seven tracts of land abutting the street between the two subdivisions. Thus, the property owners affected by the assessment included Connelly, Johnson, Nelson, and the Rusinacks. The two lots owned by Johnson on the north side of the street were included in the assessment. The lot owned by Connelly on the south side of the street was also included in the assessment. The back lot owned by the Rusinacks on the south side of the street was included in the assessment, and the lot owned by Nelson was included in the assessed area because the north boundary of the lot abutted the street.

The assessment schedule was prepared by the same engineering company that had originally surveyed the land and prepared the preliminary and final plats for the Oak Hill Second Addition. The company essentially assigned a portion of the construction costs to the owners of the property abutting the proposed street according to the number of feet of property fronting the street. Under this method, the engineer proposed the following assessments:

| | |
|---|---|
| Nelson | $9417.55 |
| Rusinacks | $5481.16 |
| Connelly | $6030.18 |
| Johnson | $7663.96 |

In December 2006, Nelson, Connelly, Johnson, and the Rusinacks filed a petition with the district court to contest the assessments. The petition claimed the assessments were void because they were contrary to a city ordinance that required the subdivider to "make and install" the grading and improvement of streets within the final plat of a subdivision by "surfac[ing] or caus[ing] to be surfaced the roadways" in a manner prescribed by regulations. Hampton, Iowa, Code § 170.09(18)(A) (2002). In the alternative, the petition claimed the assessments of the properties exceeded the statutory limitations for assessments, and no special benefit was derived from the proposed improvement of the street.

The street construction project and assessments went forward, as did the lawsuit brought by the property owners on the east end of the street project. Additionally, the city hired a second engineering firm to review the final assessment schedule. The engineer recalculated the assessments of the street construction costs under a formula known as the "Flint Formula." Generally, this formula distributes the costs according to the special benefit conferred on the property as result of the paved street, based not only on the frontage foot of the property but also the depth of the property within the assessment district. The special benefits are considered in the formula by assigning a point value to each benefit. Based on the Flint Formula, the engineer determined the following assessments:

| | |
|---|---|
| Nelson | $8210.80 |
| Rusinacks | $8199.54 |
| Connelly | $9698.36 |
| Johnson Tract | $6717.41 |
| Johnson Lot | $9894.41 |

The city council considered the assessments reached by both engineers in making its final determination. It directed the final

assessments to be corrected by decreasing the amounts of the assessments against the lots owned by Connelly and Johnson by fifty percent because they were corner lots that had existing access through Oak Court and Northwest Third Street. The city council adopted the Flint Formula calculations for the tract of land owned by the Johnsons and the tract of land owned by Nelson. It increased the assessment to the tract owned by the Rusinacks in an amount between the final assessment and the Flint Formula assessment.

The street improvements were completed by the city during 2007, and a final assessment schedule and levy was adopted by the city council in January 2008.

The final costs of the project were less than the expected costs, and the five lots and tracts subject to litigation were collectively assessed $30,807.90 of the total assessed costs of $148,439.33. Ultimately, the assessments were made as follows:

| | |
|---|---|
| Nelson | $8210.80 |
| Rusinacks | $6083.30 |
| Connelly | $4849.18 |
| Johnson Tract | $6717.41 |
| Johnson Lot | $4947.21 |

The case proceeded to trial. The plaintiffs testified they would not use the new street and would derive no benefit from its presence. A property appraiser also testified on behalf of the plaintiffs. He did not value their property, but indicated that any benefit derived from the paved street was offset by the loss of privacy resulting from the street and the increased traffic. The city introduced expert testimony showing the street increased the value of plaintiffs' properties. The testimony applied the Flint Formula, as well as other factors.

Following the trial, the district court rejected the claims by the plaintiffs that the city had no authority to assess street construction costs to them when a city ordinance made the subdivider responsible for the costs. In doing so, the district court also rejected the claim by the plaintiffs that the subdivider would have been required to pay for the street construction if the ordinance had been enforced and that they were entitled to the benefit they would have received if the ordinance had been enforced. It concluded the plaintiffs failed to state a cause of action. Finally, the district court found the plaintiffs failed to prove the assessment by the city was excessive and that their properties were not benefited by the construction of the street.

The plaintiffs filed an appeal. They first claim the city had no authority to assess the costs of making improvements because the ordinance required the subdivider to make the improvements. They assert this claim is properly raised by a petition to test the legality of the assessment and assert no assessment would have been necessary if the ordinance had been followed. Alternatively, the plaintiffs argue the assessments were excessive.

The city argues the claim by the plaintiffs based on the city ordinance is factually deficient because a portion of the street surfaced by the city was outside the subdivision, and the ordinance only makes the subdivider responsible to improve streets within the subdivision. Thus, the city asserts it was responsible to surface this portion of the street, even if the ordinance had been enforced. They also argue the city is not required to follow the ordinance, and it may utilize any available authority to make public improvements. Finally, the city argues the assessments were not excessive.

**II.  Scope of Review.**

Our review of decisions on property assessments is de novo.  *Gray v. City of Indianola*, 797 N.W.2d 112, 117 (Iowa 2011).  We give weight to the findings by the district court but are not bound by them.  *Id.*  On appeal, the plaintiffs have the burden to show that the special assessments were excessive.  *Id.*

**III.  Plaintiffs' Claim Concerning the Ordinance.**

The plaintiffs argue their claim is authorized under Iowa Code section 384.66(1) (2007).  This section permits a person to test the "legality of the assessment procedures by a petition in equity filed in district court."  Iowa Code § 384.66(1).  The plaintiffs' claim, however, does not challenge the legality of the procedures to assess property under chapter 384.  Instead, the plaintiffs have brought an equity claim predicated on the perceived unfairness of allowing the city to assess lot owners for improvements it made when a city ordinance directs the improvements to be made by a private subdivider.  They argue the city may not exercise its assessment authority under chapter 384 under such circumstances.

We agree with the city that the plaintiffs have not stated a claim under section 384.66(1).  The claim by the plaintiffs does not challenge the assessment procedures.  We also agree that those plaintiffs who own property within the Oak Hill First Addition do not fall within the parameters of the claim.  The ordinance at issue does not require a subdivider to make improvements outside the platted area of the subdivision.  Additionally, these plaintiffs make no special claim of prejudice to support any other claim other than the city was required to enforce the ordinance.  Nevertheless, those plaintiffs who own property

abutting the subdivision plat have stated a claim in equity, and it is this claim that we proceed to resolve.

### IV. Impact of City Ordinance on Assessment by the City.

Municipalities are "creature[s] of the state legislature." 1 Eugene McQuillin, *The Law of Municipal Corporations* § 3.02, at 234 (3d ed. rev. vol. 1999) [hereinafter McQuillin]. In Iowa, cities are given the power of self-government or the authority to "exercise any power and perform any function it deems appropriate to . . . preserve and improve the peace, safety, health, welfare, comfort, and convenience of its residents." Iowa Code § 364.1. One exception to the broad powers conferred to cities is the power to tax residents. A city has no power to tax unless specifically authorized by the legislature. *Id.* § 364.3(4). The assessment of the costs of street improvements is generally considered to be a form of taxation.

Our legislature has specifically authorized cities to assess the costs of building or repairing streets and other associated public improvements within its borders to property owners based on the benefit derived from the improvements. *Id.* § 384.38; *see also Des Moines City Ry. v. City of Des Moines*, 183 Iowa 1261, 1273, 159 N.W. 450, 454–55 (1916). Although the legislature has provided cities with a specific procedural mechanism for financing public improvements, it expressly recognized and reserved cities' right and power to "establish and enforce ordinances regulating the division and use of land." Iowa Code § 354.1(3). As a result, we generally employ a "liberal approach to [a city's] subdivision decisions." *Blumenthal Inv. Trusts v. City of W. Des Moines*, 636 N.W.2d 255, 268 (Iowa 2001).

Iowa's statutory property assessment authorization is found in Iowa Code chapter 384. The chapter recognizes that the construction

and improvement of city infrastructure is a necessary component to community development by establishing a procedure for the assessment of the costs to the benefited property. *See* Iowa Code § 384.61. Yet, the statutory scheme does not limit the power of a city to pursue public improvement projects through its independent authority to contract with subdividers to share in the costs of installing public improvements. *See id.* § 384.41(3). Generally, a city is authorized to enter into contracts, including contracts governing the construction of streets and the installation of public improvements. 10 McQuillin § 29:6, at 337 (3d ed. rev. vol. 2009); *see also* 13 McQuillin § 37:98, at 362 (3d ed. rev. vol. 2008).

Streets and other public services are a normal part of most real estate development, especially development projects involving the subdivision of land. A subdivision divides a tract of land into multiple lots and generally requires the development and integration of streets and other public services. *See* Iowa Code § 354.6(1)–(2) (defining standards for subdivision of private property and including requirement that recorded subdivision plats clearly designate area reserved for streets and other future public areas). A subdivider works with the owner of the tract to ultimately develop the land into lots for sale with the goal of making a profit from the sale of the lots.

The city subdivision ordinance at issue in this case regulates the construction standards that must be met before a final plat is approved by the city council for recording and includes a requirement that all subdivisions include streets and storm sewers, as well as water and sanitary sewer lines. *See* Hampton, Iowa, Code § 170.09(18). The ordinance conditions the city council's approval of a final plat of a subdivision upon the subdivider "mak[ing] and install[ing]" the

improvements pursuant to detailed specifications, procedures, and oversight by the city. *Id.* The ordinance does not address the authority of the subdivider to contract with other entities to install the improvements. Generally, the obligations of one can be performed by another. *See* Restatement (Second) of Contracts § 318, at 19 (1981) (noting the general rule that the duty to perform may be delegated).

The logical premise behind the imposition of an obligation on the subdivider to make public improvements within a subdivision is that the subdivider can pass the expense of the work to lot owners by adjusting the price of the lots. *See Preston v. Oliphant*, 256 Iowa 128, 130, 126 N.W.2d 329, 329–30 (1964) (buyers of residential property sued seller for failing to install roads and other improvements promised to be included in purchase price of lot); *Village Square No. 1, Inc. v. Crow-Frederick Retail Ltd. P'Ship*, 551 A.2d 471, 474 (Md. Ct. Spec. App. 1989) (noting, in argument, that cost of roads and sewers provided at the expense of the developers is passed on by the developer to the ultimate owners of the property). *See generally* Jerry S. Williford & C. Todd Sinnett, *Tax Planning for the Developer: Allocating Costs Among Land and Improvements*, 103 J. Tax'n 335, 342 (2005) (recognizing developers must account for all expenses involved in making improvements to property and that improvements made to land should be allocated to the different lots or parcels for tax purposes). Thus, the costs of the improvements are ultimately borne by the property owners who are the primary beneficiaries of the improvements, just as is ultimately done under the assessment procedures of chapter 384 when the city incurs costs in making street improvements. *See Divan Builders, Inc. v. Planning Bd. of Twp. of Wayne*, 334 A.2d 30, 39 (N.J. 1975) (noting the end result of a city requiring the developer to fund improvements in a subdivision is the

same as though the city directly assessed the costs against the owners of the property within the subdivision).

The fighting question presented in this case is whether the city may exercise its statutory assessment authority to defray the costs of making street improvements as a part of the development of a subdivision when an ordinance conditions the city's approval of the subdivision plat on the private subdivider making the improvements. At its core, the resolution of this issue hinges on a more narrow question of whether the ordinance imposed a mandatory enforcement obligation on the city.

Generally, the question whether a municipality is required to enforce its ordinances has been obliquely addressed within the parameters of such legal concepts as standing and the discretionary function immunity. *See Schmitz v. City of Dubuque*, 682 N.W.2d 70, 74 (Iowa 2004) (applying a two-part test for discretionary immunity to actions of city in constructing trail); *White v. Robinson*, 260 S.W.3d 463, 472 (Tex. Ct. App. 2008) (holding referendum sponsors lacked standing to challenge city's construction of, and refusal to enforce, an adopted proposition). Additionally, other legal theories have surfaced in the context of tort liability involving the failure to enforce an ordinance. *See Ball v. Town of Woodbine*, 61 Iowa 83, 85, 15 N.W. 846, 847 (Iowa 1883) (holding city not liable when council members, who shot off fireworks in violation of city ordinance, injured citizens); *accord Harris v. City of Des Moines*, 202 Iowa 53, 58, 209 N.W. 454, 455 (1926) (holding failure to enforce municipal ordinance regulating streets did not impose liability on municipality). Yet, the action in this case is framed solely in equity and only seeks a declaration that the city may not exercise its assessment authority. Thus, we must decide if the city's failure to

enforce an ordinance conditioning approval of a subdivision plat upon the subdivider financing street improvements prevents the city from waiving the condition and instead exercising its statutory authority to assess the costs it incurs in making the improvements.

One approach we have taken to decide whether the governmental failure to fulfill the terms of an ordinance affects the validity of subsequent government action is to consider whether the specific terms of the ordinance are mandatory or directory. *Cf. Taylor v. Dep't of Transp.*, 260 N.W.2d 521, 522 (Iowa 1977) (considering whether a statute is mandatory or directory). Under this approach, when the enactment at issue does not expressly resolve the question, we look to the main objective of the enactment to determine if the requirement is essential to furthering the objective. *Id.* at 522–23. If it is, the requirement is ordinarily mandatory, and the failure to perform the requirement invalidates the subsequent governmental action. *Id.* While other related approaches could be considered, we find this approach particularly helpful in the resolution of this case.

In making this determination under subdivision regulations, we also apply the statutory requirements for cities considering subdivision plats under chapter 354. If the ordinance at issue is required to be enforced, the city is directed by the legislature to "apply reasonable standards and conditions in accordance with applicable . . . ordinances." Iowa Code § 354.8. Otherwise, the city is granted the authority to approve plats for recordation by considering "the possible burden on public improvements and . . . a balance of interests between the proprietor, future purchasers, and the public interest in the subdivision." *Id.*

In this case, the City of Hampton ordinance does not expressly resolve the issue, but the purpose of the condition is expressly described in the opening paragraph of the subdivision regulation chapter. The declared purpose or objective is "to establish minimum standards for the design, development and improvement" of subdivisions so as to protect "existing developments" and to make adequate provisions "for public services," and to promote "health, safety, and general welfare." Hampton, Iowa, Code § 170.01. Additionally, the ordinance seeks to ensure improvements are uniformly made in accordance with certain specifications to the city's satisfaction. *Id.* § 170.03. The ordinance describes specific requirements for the submission of subdivision plats for approval by the city, and it specifies a host of rules required for the development of a subdivision. Thus, we must decide if the city's failure to enforce the plat approval condition requiring the subdivider to personally finance the improvements would undermine these objectives.

We recognize a certain symmetry in using subdividers to help build streets and install other public services within the development of a city. The city, of course, has the authority to make such improvements and to pass the costs onto abutting property owners who most benefit from the improvements through assessment procedures. *See* Iowa Code § 384.38(1)–(2). Yet, the same end result occurs when the requirement to make improvements within a subdivision is given to a subdivider. When improvements are made by a subdivider, the costs of the improvements are still passed to those property owners who most benefit from the improvements, but through the use of free-market forces instead of a forced assessment. In many instances, the two approaches work to develop city streets without overlap. However, unique circumstances can

arise that may justify a shared development effort between subdividers and the city. The background of this case presents a good illustration.

Here, the particular area of the subdivision where the property was divided into lots was separated from the nearest existing street by over 300′. This portion of the subdivision could not be connected to the existing street without extending the street to reach the area containing the subdivided lots. The presence of the extended street and the underground improvements arguably benefited property owners outside the subdivision. If the subdivider was required to make all of the improvements, the subdivider would have no means to pass the costs to those outside property owners. Instead, the subdivider could only pass on the costs through the sale of the lots. The result is the property along the street but outside the plat would receive the benefit of the street without the owner paying for the benefit. Moreover, the sale price of the subdivided lots within the subdivision may need to be increased beyond what the market forces would bear, forcing the subdivider to ultimately shoulder the costs. In any event, such unique circumstances can disrupt the normal symmetry of the city-subdivider approach to make public improvements. Importantly, the objectives of the ordinance to protect existing developments, make adequate provisions for public services, and promote the general welfare could be undermined if the city and subdivider could not work together to make street improvements under some circumstances. The city's development through subdivision could be adversely affected, and street development near existing developments could suffer as well.

Thus, we conclude that the portion of the ordinance requiring the subdivider to make improvements as a condition to the city's approval of a plat does not describe a mandatory enforcement duty on the city.

Instead, the city may waive its subdivision plat approval standards when the objectives of its standards would not be met by strict adherence to them and when waiver would not otherwise conflict with the mandatory platting standards contained in Iowa Code chapter 354. *See York v. Town of Ogunquit,* 769 A.2d 172, 177 (Me. 2001) (recognizing the authority of city planning board to waive subdivision standards but not to waive zoning provisions subject to analysis mandated by state statute); *see also City of Mequon v. Lake Estates Co.,* 190 N.W.2d 912, 917 (Wis. 1971) (finding city acted within delegated authority conferred by legislature in varying subdivision standards in ordinance in special agreement with subdivider). *But see Allen v. St. Tammany Parish Police Jury,* 690 So. 2d 150, 153 (La. Ct. App. 1997) (noting language conditioning final subdivision approval upon design details and specifications approved by department of public works imposed mandatory obligation on city). Such an approach is consistent with the legislature's grant of authority to cities in development planning as well as our court's flexible approach to city subdivision decisions. *See* Iowa Code § 354.1(3); *see also Blumenthal Inv. Trusts,* 636 N.W.2d at 268. Consequently, the city's failure to require the subdivider to personally make all improvements does not invalidate the authority of the city to assess property owners under chapter 384.

### V. Special Benefit to Property Assessed.

The statutory scheme for the assessment of costs incurred by a city in making public improvements provides that lots in the assessment district may be assessed according to the special benefit conferred on the property. Iowa Code § 384.61. One qualification, however, is the assessment cannot exceed twenty-five percent of the property value. *Id.* § 384.62(1). The statutory assessment scheme seeks to protect

individual property owners from subsidizing the benefit from improvements enjoyed by the public in general. *Horak Prairie Farm, L.P. v. City of Cedar Rapids*, 748 N.W.2d 504, 507 (Iowa 2008).

When a municipality has properly made public improvements, a presumption of necessity arises, as well as a presumption that some benefit has resulted to assessed property owners. *Goodell v. City of Clinton*, 193 N.W.2d 91, 93 (Iowa 1971). The law not only presumes the assessments are correct, but it also presumes that they do not exceed the special benefit derived. *Id.* Many factors are considered in the assessment, including the future use and expectations of the property, as well as its present use. *Id.* Mathematical exactness is not required. *Gray*, 797 N.W.2d at 119.

The plaintiffs argue the new street does not provide any special benefit to them. They point out that the street does not provide access that did not previously exist. Moreover, they point out that any benefit from the street is offset by the loss of privacy. Primarily, the plaintiffs argue the street is not something they desired and was only installed to allow access to the new lots within the subdivision.

The arguments made by the plaintiffs are familiar. In *Gray*, we reiterated our understanding of the displeasure felt by property owners who are asked to share in the expense of street improvements they did not want or believe will provide any benefit to them. *Id.* at 118–19. Yet, these arguments are insufficient to rebut the presumption that the assessments were correct. *Id.* at 119.

The property in dispute in this case was ultimately assessed by considering a wide variety of factors in conjunction with the Flint Formula. *See Milton O. & Phyllis A. Thorson Revocable Estate Trust v. City of W. Des Moines*, 531 N.W.2d 647, 650 (Iowa Ct. App. 1995)

(identifying factors the court will consider when distinguishing between a general benefit and a special benefit).  Even though the plaintiffs testified they would not use the street, the improvements did increase the value of their property, especially the three parcels of land west of Oak Hill First Addition.  The presence of the street abutting these tracts increased their value as future residential development.  Moreover, the mere transformation of the street from gravel and dirt to pavement conferred a number of benefits on the Connelly and Johnson lots located within Oak Hill First Addition, even though the lot owners were personally satisfied with a dirt street.  *See Gray*, 797 N.W.2d at 119 (recognizing that the pavement of a gravel road confers substantial benefits on abutting landowners).  Nevertheless, the city council understood the benefits to these two lots were not as great as the benefit provided to the other three tracts and substantially reduced the assessments.  Overall, the plaintiffs did not establish the assessments to their property exceeded the special benefit provided by the improvement.  The assessments did not exceed twenty-five percent of the value of the property owned by the plaintiffs.

**VI.  Conclusion.**

We have carefully considered all issues raised in this appeal.  We affirm the decision of the district court.

**AFFIRMED.**

