944 A.2d 1

TOLL BROS., INC. AND LAUREL CREEK, L.P., PLAINTIFFS-APPELLANTS, v. BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF BURLINGTON AND THE PLANNING BOARD OF THE COUNTY OF BURLINGTON, DEFENDANTS-RESPONDENTS.

Argued October 23, 2007—Decided March 31, 2008.

224

*Carl S. Bisgaier* argued the cause for appellants (*Flaster/Greenberg,* attorneys; *Mr. Bisgaier and Richard J. Hoff, Jr.,* on the briefs).

*Anthony T. Drollas, Jr.* argued the cause for respondents (*Capehart Scatchard,* attorneys).

Justice LONG delivered the opinion of the Court.

 In enacting the Municipal Land Use Law (MLUL), the Legislature set forth, in detail, the procedural and substantive standards it intended to guide municipalities in the exercise of the delegated zoning power over the use and development of land. Among the questions presented on this appeal are the following: (1) whether, by way of a developer's agreement, a developer can contract to pay more than its pro-rata share for off-tract improvements, which payments could not be imposed by resolution under the MLUL; (2) whether conditions regarding off-tract improvements must be satisfied even when the scope of the developer's project materially changes; and (3) whether a developer's agreement immunizes such conditions from a changed circumstances analysis.

We answer all three questions in the negative. Under the MLUL, a planning board may only impose off-tract improvements on a developer if they are necessitated by the development.

Concomitantly, a developer cannot be compelled to shoulder more than its pro-rata share of the cost of such improvements. *N.J.S.A.* 40:55D–42; *Holmdel Builders Ass'n v. Twp. of Holmdel,* 121 *N.J.* 550, 570–71, 583 *A.*2d 277 (1990). It follows that a planning board violates the MLUL when a condition unrelated to the needs generated by a development is imposed or, if related, places on the developer an exaction in excess of its proportional share. That is so even if the developer is a willing participant in a separate developer's agreement. A developer's agreement is a contract between the developer and the municipality that details the manner in which the conditions of approval will be fulfilled. It is ancillary to those conditions and is only enforceable to the extent that the conditions on which it is based are enforceable. Moreover, conditions of approval are not immutable; when the proportional effect of the public need generated by a project is materially changed by virtue of a significant reduction in the scope of the proposed development, the developer is entitled to an opportunity to demonstrate before the planning board that a recalculation of its contribution is warranted. The fact that the developer has entered into a developer's agreement is of no consequence to that entitlement.

I

The facts of this case unfold over several decades with multiple characters playing various roles. The principal property is a 540–acre site located in Burlington County: 499.25 acres are in Moorestown Township and 31.06 acres are in Mount Laurel Township. In 1987, the Moorestown Foursome Partnership (Foursome) owned the property and intended to build a multiple-use development named Laurel Creek. Foursome envisioned Laurel Creek as a commercial, residential and retail destination, with 1.2 million square feet of office space, 47,000 square feet of retail space, 460 residential units, and an 18–hole golf course with a 25,000–30,000 square-foot country club. The largest portion of the development

was to be located in Moorestown Township, with only the country club and retail property located in Mount Laurel Township.

One of the general partners of Foursome was Thomas R. Whitesell. In addition to his equity interest in Foursome, Whitesell was also a general partner in TRW Land, L.P. (TRW). TRW bought property adjacent to the Foursome site with the intention of building a 500,000 square-foot office park to be known as Laurel Creek Corporate Center (the Corporate Center). That property is exclusively located in Mount Laurel Township.

In the late 1980s, Foursome and TRW sought various zoning variances and waivers from Moorestown Township, Mount Laurel Township, and Burlington County for the development of their parcels. Interstate 295 provided an exit ramp near the properties. The surrounding area was essentially rural and undeveloped, and the roads bordering the properties were all primarily two-lane minor arteries. Thus, the proposed developments raised obvious concerns regarding increased traffic. Of particular concern were Centerton Road and Creek Road, which intersect in Mount Laurel near the I–295 interchange.

Although it is not clear whether Foursome and TRW considered Laurel Creek and the Corporate Center a common concept plan, the local governing bodies handled both developments as one overall planning concern. To address the potential traffic problems generated by the proposed developments, two traffic engineering studies were produced. The reports are highly detailed and resist easy summary. However, two conclusions are clear: the Centerton Road/Creek Road intersection would be unable to accommodate the projected increased traffic to be generated by the combined Foursome and TRW projects at completion, and Centerton Road would have to be realigned to intersect with Creek Road further north in order to decrease congestion. The reports offered further suggestions, such as road-widening, physical barriers, and signalizing. Those recommendations were predominantly based on increased traffic patterns in peak hours due to the various types of forecasted development.

In response to the reports, the local planning authorities conditioned their preliminary approvals on the developers' willingness to make the requisite improvements. On September 8, 1988, the Mount Laurel Planning Board granted Foursome conditional preliminary subdivision approval for the portions of Laurel Creek located in its municipality, premised on the relocation of the intersection: "[U]ntil the intersection of Centerton and Creek Road is relocated, no building permit shall be issued which will permit more than 18% build out of the project." Although the conditional approval was for Laurel Creek, the 18% trigger accounted for the traffic that would result from TRW's development of the Corporate Center as well, as evidenced by the Board's requirement that Foursome submit a letter setting forth the amount of build out that Foursome *and* TRW would each produce prior to the roadway development. In a letter dated September 23, 1988, Foursome notified the Board that, along with TRW, it agreed to "construct the improvements depicted on the Concept Plan/Centerton Road Realignment." That letter was followed by a joint letter signed by Foursome and TRW, dated March 21, 1989, wherein both developers acknowledged their commitments and outlined the amount each developer would individually construct to reach the 18% trigger.

On November 3, 1988, the Moorestown Planning Board granted Foursome conditional preliminary major subdivision approval for the Moorestown portion of Laurel Creek. Again, treating the projects as a single unit, the Board resolution stated that Foursome, "together with [TRW], shall be responsible for all of the improvements to the intersection of the relocated Centerton Road and Creek Road."

The Burlington County Planning Board likewise required the roadway improvements. In a letter to the Burlington County Engineer's Officer dated October 24, 1988, Foursome agreed that it, along with TRW, would be responsible for certain off-tract improvements. The developers anticipated a total cost of approximately $2.1 million, with Foursome and TRW contributing approx-

imately 75% and 25%, respectively, and in other correspondences recognized that they were contributing more than their fair share for the improvements.

Based on those joint assurances, the Burlington County Planning Board conditionally approved the preliminary subdivision on February 28, 1989, and required Foursome to enter into a developer's agreement memorializing the proposed improvements. At that point, as had been the case since the inception of the projects, the proposals of Foursome and TRW involved: 1.7 million square feet of commercial space; 47,000 square feet of retail space; 460 residential units; and an 18–hole golf course with a 25,000–30,000 square-foot country club. All but 500,000 square feet of commercial space was attributable to Foursome's project.

When the national economy declined in the early 1990s, Foursome and TRW apparently experienced financial difficulties. Before the downturn, Foursome had only constructed the golf course and a 24,000 square-foot country club, which itself was a reduction from its original 25,000–30,000 square-foot design. When the real estate market plummeted, Foursome abandoned its remaining plans. Similarly, TRW did not seek final approval for the Corporate Center—that project would lie dormant for approximately ten years. Neither Foursome nor TRW widened Centerton Road or relocated the Centerton Road/Creek Road intersection during that time period.

In September 1994, with foreclosure proceedings looming against Foursome, Toll Brothers, Inc. (Toll Brothers) acquired Foursome's interest in Laurel Creek. Pursuant to an agreement between the parties, Foursome transferred title to the Laurel Creek development to Toll Brothers, including the prior municipal and county approvals, and the conditions imposed thereon. To recommence development, Burlington County required Toll Brothers to execute the developer's agreement first contemplated by Foursome.

On July 12, 1995, Toll Brothers executed a developer's agreement with the Burlington County Board of Chosen Freeholders.

The purpose of the agreement was to memorialize the responsibilities and obligations of Toll Brothers in completing the improvements required by the Planning Board. The agreement required specific improvements "based upon the proposed development's impact upon County roads and drainage facilities"; five years later, a new master plan designated Centerton Road as a county road. As part of the "General Terms and Conditions," the parties covenanted that Toll Brothers "shall be responsible and solely liable to complete all construction and/or installation of all improvements and to acquire all necessary right-of-way in connection with those improvements at its sole cost."

Among other provisions, under the heading "Intersection Improvements," the agreement reads as follows:

> 1. The intersection improvements at Creek Road/Centerton Road ... and the intersection improvements at Borton Landing Road/Hartford Road shall be completed by Applicant on or before building permits are issued for any building/improvements *which shall generate greater than 18% of the projected traffic ... for the entire proposed development as set forth in the letter from Michael E. Merkle (representing the Moorestown Foursome Partnership) and Thomas R. Whitesell (representing TRW Land L.P.) to the Mount Laurel Planning Board dated March 21, 1989, ....* No additional building permits or approvals shall be issued once the 18% threshold has been reached until the above-referenced intersection improvements are completed.
>
> [ (Emphasis added).]

In contemplation of final site plan approval for the subdivision, the Office of the County Engineer sent Toll Brothers a letter in November 1998. That letter reiterated the conditions within the developer's agreement:

> 11. *The developer will be responsible to make substantial improvements in order to offset the impact above and beyond what his percentage impact may be in this case.* For instance, realigning Centerton Road and improving the intersections along Creek Road will be the responsibility of the developer. Because of the substantial impact of this development a basic contribution is not applicable in this case.
>
> [ (Emphasis added).]

Following the execution of the developer's agreement, Toll Brothers sought subdivision and site plan approval for Phase 1 of its developments. Phase 1 included three subdivisions within the eastern portion of its property located in Moorestown Township:

1A, an office complex of approximately 74,400 square feet; 1B, an office complex of approximately 110,886 square feet; and, 1C, an office complex of approximately 145,530 square feet.

As the Township and County Planning Boards contemplated the subdivision plan, Toll Brothers reiterated its commitment to the roadway developments on numerous occasions. For example, a file memorandum written by the County Engineer memorializing a meeting he had with Toll Brothers indicates that he informed Toll Brothers that it was responsible for the Centerton Road/Creek Road realignment and all associated improvements, not just a contribution. At that time, Toll Brothers' attorney apparently mentioned the possibility of reimbursement from TRW, and the County Engineer stated if Toll Brothers "need[s] to have [TRW] help ... with the cost, then [it] need[s] to work out a deal with Whitesell."

Toll Brothers received subdivision approval and conditional site plan approval for Phase 1A from the County Planning Board on April 27, 1999. That approval was conditioned on Toll Brothers being "100% responsible to realign Centerton Road." The Moorestown Planning Board likewise granted Toll Brothers preliminary and final site plan approval for Phase 1A on October 28, 1999. Toll Brothers has since built Phase 1A. When it granted site plan approval for Phase 1A, Moorestown also granted Toll Brothers preliminary approvals for Phases 1B and 1C. Those approvals were based on the agreement that Toll Brothers would construct the road improvements to Centerton Road. In a letter from the Office of the Burlington County Engineer to the Moorestown Planning Board, which was copied to Toll Brothers' attorney, the County noted:

3. The traffic report for Phase 1C states that the next phase of Laurel Creek Office Complex beyond Phase 1C will trigger the need for long term improvements at the intersection of Creek & Centerton such as the realignment of Centerton Road. The developer is fully responsible for the intersection improvements at Creek and Centerton Road that includes the Centerton Road realignment when the ultimate improvement is needed.

Phase 2 comprised the bulk of the commercial development—
approximately 870,000 square feet of office space. That phase was
originally designed for the southeast portion of the Laurel Creek
property that was located in Moorestown Township, abutting
Centerton Road to the west. By November 2000, however, Toll
Brothers contracted to purchase Winner Farm, a property across
Centerton Road, directly south of the Phase 1 parcel. With the
acquisition of Winner Farm, Toll Brothers modified its develop-
ment strategy. Instead of its original design, Toll Brothers
sought to relocate Phase 2 (870,000 square feet of commercial
space) to Winner Farm in order to construct a self-contained office
park in the hope of landing Lockheed Martin as a tenant. Thus,
although the same intensity of development existed at that point,
the location of the buildings differed. In addition, to fill the
vacancy created by the removal of office space from Laurel Creek,
Toll Brothers proposed constructing a 122–unit senior-citizen resi-
dential community, Laurel Mews. In that respect, by 2000, Toll
Brothers had *increased* the scope of its project beyond what
Foursome had originally contemplated.

On January 23, 2001, the County Planning Board granted Toll
Brothers conditional subdivision approval for Phases 1B and 1C.
In contemplation of the municipality's approval of Phase 1B, 1C,
and Phase 2, Toll Brothers and Moorestown Township entered
into a developer's agreement on April 16, 2001. That agreement
was based, in part, on "Concept Plan Section II" and "Concept
Plan Section III" submitted by Toll Brothers in applying for final
approval for Phases 1B and 1C. The agreement memorialized the
Township's final approval of Phase 1A, and further chronologized
the incremental improvements agreed upon by both parties. The
approval for Winner Farm was conditioned on Toll Brothers
completing the roadway improvements that were necessary to
accommodate the new tenants. The approval noted that the
developer's agreement "on the original Laurel Creek development
requires that this improvement be made before any construction
permits be issued for any buildings beyond what has already been
constructed." By late 2001, Toll Brothers had received conditional

approval for Laurel Mews and Winner Farm from Moorestown. The Township rezoned the Phase 2 area of Laurel Creek to a senior-citizen residence district and placed Winner Farm in a specially restricted commercial district.

In pursuing Lockheed Martin as a tenant, Toll Brothers sought to delay construction of Phase 1C of Laurel Creek and focused primarily on Winner Farm. By letter dated August 16, 2001, Toll Brothers asked the County Engineer for leniency on the timeline for the Centerton Road improvement requirement "to the extent necessary to enable us to proceed with the Lockheed Martin requirement." Toll Brothers assured the County that "[t]he plans for Centerton and Creek Road are nearly complete. . . . We are preparing right-of-way plans now and will be initiating contact with affected property owners shortly." The predicted time of completion of the improvements once started was six months. That representation was made at a time when Toll Brothers' complete project was still in the works.

On February 19, 2002, Whitesell, no longer acting through TRW, submitted applications to the Mount Laurel Planning Board to develop four office buildings on its property, totaling approximately 400,000 square feet. Apparently, while Toll Brothers was in the process of obtaining approvals for Winner Farm from Moorestown Township and Burlington County, Whitesell was negotiating with Lockheed Martin for a self-contained office park on Whitesell's property, which was closer to the intersection of Centerton and Creek Roads and the I–295 exchange. For these specific purposes, Whitesell had formed a new corporation, Centerton Road, L.L.C., and proceeded to secure the conglomerate as a tenant in its first two buildings with an option for the third.

On March 26, 2002, the County Planning Board granted Toll Brothers conditional site plan approval for Winner Farm, conditioned on the developer complying with the terms of the developer's agreement. Two days later, the Mount Laurel Planning Board granted Whitesell conditional preliminary major subdivision approval with bulk variances and preliminary site plan approval

for its new office design. As one of the conditions, Whitesell was responsible for "pro-rata share contributions for off-site road improvements" of Centerton Road. At a hearing concerning the approval, Mount Laurel indicated that, due to the 1995 developer's agreement, the County had "jurisdiction over this application with respect to Creek Road improvements and may impose such requirements as the [County] deems appropriate." The County Planning Board calculated that Whitesell's estimated impact on the Centerton Road/Creek Road intersection in relation to Toll Brothers was only 7.7%, which totaled a contribution of $328,020 based on an approximate total cost of $4.26 million. The genesis of that calculation is unclear.

The County's requirement that Toll Brothers pay for the entire off-tract improvement as a condition of site plan approval, while requiring Whitesell to contribute only 7.7% as its pro-rata share, sparked multiple actions by Toll Brothers against the County, the Mount Laurel Planning Board, and Whitesell. On June 3, 2002, Toll Brothers filed a complaint in lieu of prerogative writs against the Mount Laurel Planning Board and Whitesell Construction Co., challenging Whitesell's approvals. On July 16, 2002, Toll Brothers and Laurel Creek, L.L.P. filed a complaint for declaratory and injunctive relief and damages against the Mount Laurel Planning Board and Thomas R. Whitesell, Whitesell Enterprises, Whitesell Construction Co., Inc., Centerton Road, L.L.C., and TRW. The action was essentially based in contract, claiming that Whitesell was obligated by the initial agreements between TRW and Foursome to pay 25% of the costs of the improvements. The action further alleged that Mount Laurel unlawfully discriminated between the developers insofar as the municipality held Toll Brothers accountable to the developer's agreement yet allowed Whitesell to present new traffic studies to the Board. On July 30, 2002, Toll Brothers filed a third complaint in lieu of prerogative writs for declaratory relief and damages against the Mount Laurel Planning Board and Whitesell.

In addition to the cases against Mount Laurel and Whitesell, on January 17, 2003, Toll Brothers brought the action now pending before the Court, seeking a declaratory judgment invalidating the 1995 developer's agreement between it and the Burlington County Board of Chosen Freeholders or, in the alternative, a declaration that the conditions of approval should be modified to reflect the significant change in the original development scheme.

By early 2003, having lost Lockheed Martin as a tenant, Toll Brothers focused on constructing Laurel Mews. On March 6, 2003, the Moorestown Planning Board granted Toll Brothers conditional preliminary and final subdivision approval, as well as site plan approval for the construction of the 122 age-restricted residential units. Subdivision and site plan approvals were conditioned upon Toll Brothers "construct[ing] all improvements to Centerton and Hartford Roads as depicted on plans submitted and approved by the Township Engineer," in accordance with their April 16, 2001, developer's agreement. On March 21, 2003, Toll Brothers filed a complaint in lieu of prerogative writs against the Moorestown Planning Board, claiming that the improvements memorialized in its 2001 developer's agreement were based on the original plan and that Toll Brothers should be granted relief because that plan had, in great measure, been abandoned. Meanwhile, on April 24, 2003, the County Planning Board denied Toll Brothers' application, reiterating that Toll Brothers had to comply with the 1995 developer's agreement and realign Centerton Road prior to any additional site plan approvals.

By that point, Toll Brothers had abandoned its plans for Winner Farm and thus did not provide the County with a required site plan or subdivision proposal for the property. As a result, the County Planning Board denied Toll Brothers' application in April 2003. The Board also cited Toll Brothers' failure to provide the mandated interchange improvements as a basis for rejecting the site plan request. In May 2003, Toll Brothers' contract to purchase Winner Farm terminated. The County has since procured Winner Farm for open space preservation, thus barring any

consideration of future development. Having permanently abandoned its plan to construct 870,000 square feet of commercial space on Winner Farm, the gravamen of Toll Brothers' complaint against the County became the need to recalculate its off-tract exactions due to the significant downsizing of its project.

As it currently stands, Laurel Creek contains 460 residential units, an 18–hole golf course, a 24,000 square-foot clubhouse, and 74,000 square feet of office space (Phase 1A); Phases 1B and 1C (totaling an additional 256,416 square feet of office space) have received conditional approval from both the Township and County. Toll Brothers has abandoned its 870,000 square-foot office space design for Phase 2 and instead currently has municipal approval to build 122 age-qualified residential units. Having built only a fraction of what had been projected, yet liable for all roadway improvements, now estimated at approximately $5,000,000, Toll Brothers seeks reformation of the conditions and the developer's agreement with the County to more adequately reflect its pro-rata share.

The trial judge consolidated the pending cases, and granted summary judgment to all defendants. In ruling for the County and for Moorestown, the judge found the terms of the developer's agreements "clear and unambiguous," and stressed that Toll Brothers "reaped the benefits" of the agreements "until it was time to absorb the burdens of [them]." The judge rejected Toll Brothers' contention that it should be allowed to move before the County Planning Board to demonstrate that there was a change in circumstances because that argument "confuse[d] a Developer's Agreement with an ordinary condition of approval" and would "ignore[ ] basic principles of contract law that preclude[ ] such reconsideration."

The judge also held that Toll Brothers had no contractual claim against Whitesell, finding "no support in the record ... to sustain any claim for damages for breach of contract by Whitesell as Toll was not a party to nor an anticipated third party beneficiary to any formal Whitesell agreement."

Toll Brothers appealed. In affirming with respect to the County's motion for summary judgment, the Appellate Division recognized that the MLUL prohibits the government from requiring off-tract improvements beyond a developer's pro-rata share and further, that the County could not impose the condition at issue here because it "would be significantly greater than the need for the improvements generated by the reduced scope of the proposed development." *Toll Bros., Inc. v. Bd. of Chosen Freeholders of Burlington,* 388 *N.J.Super.* 103, 123, 906 *A.*2d 476 (App.Div.2006). However, the panel went on to hold the MLUL limitation inapplicable to a voluntary agreement. Because the developer's agreement called upon Toll Brothers to construct and pay for the improvements once the 18% threshold was crossed, the panel viewed as irrelevant the fact that there was a reduction in the final scope of the project. *Id.* at 129–30, 906 *A.*2d 476.

With respect to the developer's agreement between Toll Brothers and Moorestown Township, however, the Appellate Division interpreted the specific contractual language as requiring staged improvements that were linked to the original development plan, thus reversing the trial judge. *Id.* at 130–32, 906 *A.*2d 476. The panel rejected Toll Brothers' contractual claims against Whitesell and held Toll Brothers solely liable for the terms of the agreement. *Id.* at 133–34, 906 *A.*2d 476.

Toll Brothers filed a petition for certification limited to a single issue, the enforceability of the developer's agreement with the County, and we granted certification. 191 *N.J.* 315, 923 *A.*2d 230 (2007).

## II

Toll Brothers argues that the MLUL prohibits exactions from a developer that are not necessitated by its project; that irrelevant or disproportionate conditions cannot be imposed as a basis for approval; that that rule is equally applicable to a developer's agreement, which is nothing more than an implementing tool with no independent enforceability; and that, in light of the reduction

of its project by 870,000 square feet, it is entitled to apply to the County Planning Board for a concomitant reduction in its share of the road improvements based on changed circumstances. According to Toll Brothers, it only agreed to the conditions when its original plan for 1.2 million square feet of development was still in effect, and it immediately sought relief from the conditions when its position materially changed. Finally, it argues that the County always knew that any imposed conditions were subject to change if the scope of the project was materially altered and, therefore, the County could not reasonably have relied on the conditions or the developer's agreement in dealing with other applicants.

The County's argument, in essence, is that the developer's agreement is a binding contract, separate from the conditions of approval; that unlike the conditions of approval, the developer's agreement is not subject to the constraints in the MLUL or to a changed circumstances analysis; that even if changed circumstances can be advanced, only complete abandonment of a project warrants relief; that Toll Brothers cannot establish that traffic conditions generated by its present plans do not require the improvements; and that Toll Brothers continually represented its willingness to complete the road improvements, as a result of which the County changed its position vis-à-vis later developers to its detriment. For all those reasons, the County argues that Toll Brothers is barred from relief.

## III

A municipality's authority to plan and zone and, in so doing, to impose conditions on a developer, is a delegation of police power. *Riggs v. Twp. of Long Beach,* 109 *N.J.* 601, 610, 538 *A.*2d 808 (1988) ("Municipalities do not possess the inherent power to zone, and they possess that power, which is an exercise of the police power, only insofar as it is delegated to them by the Legislature."); William M. Cox, *New Jersey Zoning and Land Use Administration* § 4–3.1 at 80 (Gann 2007) ("[Planning] boards are the creatures of statute and may exercise only those powers

granted by statute."). Because a municipality's power to effectuate planning schemes stems from legislative allowance, it must be exercised in strict conformity with the delegating enactment—the MLUL. *Ibid.; see also Kode Harbor Dev. Assocs. v. County of Atl.*, 230 *N.J.Super.* 430, 440, 553 *A.2d* 858 (App.Div.1989) ("[A] county's powers are restricted to those granted to it by the Legislature.").[1]

 The essential purpose of the MLUL is to

guide the appropriate use or development of all lands in this State, in a manner that will promote the public health, safety, morals, and general welfare. The power of municipalities to zone is delegated by the Legislature and its exercise must conform to the boundaries of that delegation. Thus, a zoning ordinance ordinarily must advance one or more of the purposes of the MLUL, must be substantially consistent with the land use plan element and the housing plan element of the master plan, and must comport with due process and the statutory procedures for adoption.

[*Swanson v. Planning Bd. of Hopewell*, 149 *N.J.* 59, 66, 692 *A.2d* 966 (1997) (Stein, J., concurring) (internal quotations and citations omitted).]

Of particular importance to this case is *N.J.S.A.* 40:55D-42, which provides the boundaries of a public entity's power with respect to off-tract improvements:

The governing body may by ordinance adopt regulations requiring a developer, as a condition for approval of the subdivision or site plan, *to pay the pro-rata share of the cost of providing only reasonable and necessary street improvements and water, sewerage and drainage facilities, and easements therefor,* located off-tract but necessitated or required by construction or improvements within such subdivision or development. *Such regulations ... shall establish fair and reasonable standards to determine the proportionate or pro-rata amount of the cost of such facilities that shall be borne by each developer or owner within a related and common area.*

[*N.J.S.A.* 40:55D-42 (emphasis added).]

---

[1] The Appellate Division ruled that county planning boards have jurisdiction to impose off-tract improvements under the County Planning Act, *N.J.S.A.* 40:27-1 *et seq. Toll Bros., Inc., supra*, 388 *N.J.Super.* at 122, 906 *A.2d* 476; *see also Squires Gate, Inc. v. County of Monmouth*, 247 *N.J.Super.* 1, 8, 588 *A.2d* 824 (App.Div.1991) (finding same policy considerations allowing municipal exactions applicable to counties). No party has challenged that aspect of the ruling. We are, therefore, not called upon to address the differences between the statutory language of the County Planning Act and the MLUL.

Fundamental to that provision, which codifies pre-MLUL case law, is a required, rationally based link: a municipality may only demand contributions for off-tract improvements "that [are] necessitated by the development itself, or [are] a direct consequence of the development." *Holmdel Builders Ass'n v. Twp. of Holmdel,* 121 *N.J.* 550, 571, 583 *A.2d* 277 (1990) (internal quotation and citation omitted); *see also Longridge Builders, Inc. v. Planning Bd. of Princeton Twp.,* 52 *N.J.* 348, 350, 245 *A.2d* 336 (1968) ("[S]ubdivider could be compelled only to bear that portion of the [off-tract improvement] cost which bears a rational nexus to the needs created by, and benefits conferred upon, the subdivision.").

Indeed, we have "traditionally required a strong, almost but-for, causal nexus between off-site public facilities and private development in order to justify exactions."[2] *Holmdel Builders, supra,* 121 *N.J.* at 571, 583 *A.2d* 277; *see also Vrabel v. Mayor and Council of Sayreville,* 253 *N.J.Super.* 109, 118, 601 *A.2d* 229 (App.Div.1992) (noting nexus requirement "grounded on considerations of fundamental fairness and constitutional doctrine"). There must be a consequential relation between the "needs generated by the specific development" and the costs attributable to the developer. *N.J. Builders Ass'n v. Bernards Twp.,* 108 *N.J.* 223, 228, 528 *A.2d* 555 (1987).

■■■ In assessing a developer's pro-rata share, the issue is not simply whether a particular development could single-handedly necessitate the off-tract improvement. Rather, the notion of a pro-rata share mandates "suitable cost apportionment standards"

---

[2] Our case law refers to a "rational nexus" and a "but-for, causal nexus." We view that language as consistent with the need for an "essential nexus" between the "legitimate state interest" and the exacted conditions as required under the Takings Clause of the Fifth Amendment of the United States Constitution. *Nollan v. Ca. Coastal Comm'n,* 483 *U.S.* 825, 837, 107 *S.Ct.* 3141, 3148, 97 *L.Ed.2d* 677, 689 (1987). The pro-rata requirement also comports with the "rough proportionality" mandated by *Dolan v. City of Tigard,* 512 *U.S.* 374, 391, 114 *S.Ct.* 2309, 2319–20, 129 *L.Ed.2d* 304, 320 (1994) (requiring municipality to "make some sort of individualized determination that the required dedication is related both in nature and extent to the impact of the proposed development").

to insure that other landowners do not enjoy a free ride at the expense of another's toil. *Divan Builders, Inc. v. Planning Bd. of Wayne,* 66 *N.J.* 582, 598, 334 *A.*2d 30 (1975). That requirement "protects a developer from paying a disproportionate share of the cost of improvements that also benefit other persons." *Holmdel Builders, supra,* 121 *N.J.* at 571, 583 *A.*2d 277 (internal quotation marks and citations omitted). As we noted in *Longridge Builders, supra,* "[i]t would be impermissible to saddle the developer with the full cost where other property owners receive a special benefit from the improvement." 52 *N.J.* at 350, 245 *A.*2d 336. Thus, it is beyond dispute that under the MLUL, a planning body may not condition site plan approval on a developer paying for improvements that are unconnected to its development, or if connected, paying an amount that is disproportionate to the benefits conferred on the developer.

█ To be sure, a public entity has flexibility in its method of imposing conditions:

First, it may be undertaken entirely at municipal cost and expense.... In the second place the municipality may undertake the project as a local improvement and assess the cost against the owners of the properties benefited pursuant to the procedure outlined in *N.J.S.A.* 40:56–1, *et seq.*

The third course is to require that the work be done at the expense of the developer either with or without a formula providing for partial or total reimbursement. Recourse to this third alternative, as to which there has hitherto existed some question, may be had only where appropriate local legislation permits the imposition and when it is fair and equitable that this be done.

[*Divan Builders, supra,* 66 *N.J.* at 599, 334 *A.*2d 30 (citing *Deerfield Estates v. Twp. of E. Brunswick,* 60 *N.J.* 115, 131, 286 *A.*2d 498 (1972)).]

In detailing those options, we acknowledged that "in apportioning the cost of improvements in this context the municipality enjoys a degree of flexibility. The fundamental requirement, however, is that the *end result* must be equitable." *Ibid.* (emphasis added).

█ Thus, although the entire obligation of installing off-tract improvements may, in appropriate circumstances, be imposed on a developer initially, the ultimate cost to the developer is limited to its pro-rata share. *Meglino v. Twp. Comm. of Eagleswood,* 103 *N.J.* 144, 156, 510 *A.*2d 1134 (1986) ("The overarching theme that

permeates the third course is that it be 'fair and equitable.'" (quoting *Deerfield Estates, supra,* 60 *N.J.* at 131, 286 *A.*2d 498)). The standard remains clear—under the MLUL there must be a causal nexus between the conditions imposed and the needs created by the development, and the apportionment of costs must be fair and equitable. That is the backdrop for our inquiry.

## IV

At the heart of this case is Toll Brothers' claim that it is entitled to appear before the County Planning Board to request a recalculation of its off-tract improvement obligations due to the substantial downsizing of its original design. We have long recognized that right where "a sufficient change in the application itself or in the conditions surrounding the property" has occurred "to warrant entertainment of the application." *Russell v. Tenafly Bd. of Adjustment,* 31 *N.J.* 58, 66, 155 *A.*2d 83 (1959); *River Vale Planning Bd. v. E & R Office Interiors, Inc.,* 241 *N.J.Super.* 391, 400, 575 *A.*2d 55 (App.Div.1990) ("[T]he installation of the improvements contemplated by the Developer's Agreement as a condition of site plan approval was subject to an implied or constructive condition that those improvements were required only if the developer proceeded with the project contemplated by the application and approval."); *cf. Cohen v. Fair Lawn,* 85 *N.J.Super.* 234, 237, 204 *A.*2d 375 (App.Div.1964) ("[T]he rule of *res judicata* does not bar the making of a new application for a variance, or for modification or enlargement of one already granted, or for lifting conditions already imposed in connection with the grant of a variance, upon a proper showing of changed circumstances or other good cause warranting a reconsideration by the local authorities.").

As the Appellate Division stated in *Allied Realty v. Upper Saddle River,*

a new application for a variance, or here for subdivision approval, or for modification or enlargement of one already granted, "or for lifting conditions previously imposed," [may be submitted] upon a showing that the continued enforcement of the restriction would frustrate an appropriate purpose. Changed circumstances or

other good cause may warrant reconsideration by the local authorities. To hold differently would offend public policy by countenancing a restraint upon the future exercise of municipal action in the absence of a sound reason justifying such a static approach. The question for the municipal agency on a second application thus centers about "whether there has occurred a sufficient change in the application itself or in the conditions surrounding the property to warrant entertainment" of the matter again.

[221 *N.J.Super.* 407, 414, 534 *A.*2d 1019 (App.Div.1987), *certif. denied*, 110 *N.J.* 304, 540 *A.*2d 1284 (1988) (citations omitted); *see also Park Ctr. at Route 35, Inc. v. Zoning Bd. of Adjustment of Woodbridge*, 365 *N.J.Super.* 284, 839 *A.*2d 78 (App.Div.2004) (finding insufficient change in circumstances to release developer of prior obligation).]

In fact, the MLUL explicitly codifies the right of a party to request a change in the conditions of approval in *N.J.S.A.* 40:55D–12(a), which requires public notice and hearing "for modification or elimination of a significant condition or conditions in a memorializing resolution. . . ." *See also* Cox, *supra*, § 28–4.9 at 659 (citing *N.J.S.A.* 40:55D–12(a) as evidence a developer "may, at some time in the future, make a new application to the board on the basis of changed circumstances").

The fundamental purpose of the changed circumstances application is to satisfy the nexus and pro-rata provisions of *N.J.S.A.* 40:55D–42. Indeed, where a change in the developer's plans calls into question the fairness of the original imposition, such a hearing is necessary to carry out the goals of the MLUL. Thus, Toll Brothers is on solid ground in arguing that it is entitled to seek reconsideration of the resolution, given that its present proposal is a fraction of its original design.

V

The crux of the County's claim that Toll Brothers is barred from filing an application based on changed circumstances is the developer's agreement. In particular, the County asserts that the developer's agreement is an independent and irrevocable source of obligation on the part of Toll Brothers that is not inextricably connected with the conditions of approval; it is not governed by the MLUL; and it is not subject to a changed circumstances analysis. We reject all of those claims.

A

A "developer's agreement" is a contract between a developer and a public authority that details the manner in which the conditions of approval will be fulfilled. Although not mentioned in the MLUL except in connection with general development plans under *N.J.S.A.* 40:55D–45.2(l), "the practice of entering into developer's agreements on developments not covered by the statute has become common and has been recognized by some courts." Cox, *supra,* § 24–7.5 at 565.

> Many developer agreements are merely redundant recitations of the conditions of approval. They are valuable, however, when there are complicated off-tract improvements and the developer needs to coordinate this activity with governmental entities. They are also useful in spelling out financial commitments which arise due to off-tract improvement contributions or affordable housing commitments. [David J. Frizell, 36 *New Jersey Practice: Land Use Law,* § 14.35 at 337–38 (3d ed.2005).]

Those details are typically contained in construction schedules and finance arrangements. *Id.* at 337 ("A Developer Agreement is a contract between the developer and the municipality, in which the developer agrees to fulfill the conditions of approval, completes the improvements within a time frame, pays for the inspections by the municipal engineer, and makes any other payments required by municipal ordinances.").

The principal benefit of the developer's agreement is its ability to foster cooperation between public and private entities and to insure a common understanding and predictability within the development process. Such agreements provide obvious advantages for both contracting parties. For developers, they offer an opportunity to negotiate with municipalities, which, in turn, is thought to lower the costs of development and to allow developers to plan well in advance of final approval. Shelby D. Green, *Development Agreements: Bargained–For Zoning That Is Neither Illegal Contract Nor Conditional Zoning,* 33 *Cap. U.L.Rev.* 383, 394 (2004). In a word, such agreements smooth the development process and presumably limit strife over the nuts and bolts of the actual construction of the off-tract improvements.

## B

By its very nature, a developer's agreement is not, as the County contends, an independent contractual source of obligation. Indeed, as the developer's agreement in this case expressly declares, its purpose is to help carry out the conditions imposed by the Board: "It is the desire of the County and the Applicant to enter into this agreement in order to *more clearly define the responsibilities and obligations of the Applicant in completing the improvements required by the Planning Board* in connection with the above referenced development." (Emphasis added).

That language is emblematic of the fact that a developer's agreement is an ancillary instrument, tethered to the conditions of approval, and exists solely as a tool for the implementation of the resolution establishing the conditions. Accordingly, if the resolution establishing the conditions remains in effect, the developer's agreement can be enforced. However, if the resolution changes, the developer's agreement enjoys no independent status and must be renegotiated. In essence, the continued vitality of the resolution is an implied condition in the developer's agreement, the failure of which will nullify that agreement because it eliminates the possibility that the fundamental purpose for which the developer's agreement was created will be attained. *Edwards v. Leopoldi,* 20 *N.J.Super.* 43, 89 *A.*2d 264 (App.Div.), *certif. denied,* 10 *N.J.* 347, 91 *A.*2d 671 (1952).

To suggest, as the County does, that the developer's agreement should somehow bar Toll Brothers from making the changed circumstances application that the MLUL recognizes misconceives the relationship between the conditions and the developer's agreement; it is the developer's agreement that is dependent on the conditions and not vice versa. Likewise, although the County correctly asserts that a contract generally is not subject to a changed circumstances analysis, that argument misses the point. It is the resolution that the MLUL subjects to modification based on changed circumstances. Depending on the

outcome, the developer's agreement stands or falls. In short, we do not view the ancillary developer's agreement as a bar to Toll Brothers' application for modification of the resolution setting the conditions of approval.

## C

If we were to conclude otherwise and bar Toll Brothers from returning to the Board for modification, the effect would be to approve public entities and developers entering into "voluntary" agreements in violation of the specific provisions of the MLUL. Such an approach cannot be countenanced.

Although we have not previously confronted the issue of the greater than pro-rata exactions in developer's agreements head on, in *Swanson v. Planning Board of Hopewell,* 149 *N.J.* 59, 692 *A.*2d 966 (1997), which we dismissed on timeliness grounds, Justice Stein, joined by Justices Handler and O'Hern, laid the groundwork for our analysis of the issue. Noting that the policies underlying *N.J.S.A.* 40:55D–42 require developers "to contribute to the cost of off-site improvements to only those improvements the need for which arose as a direct consequence of the particular subdivision or development under review," Justice Stein stated that municipalities making zoning decisions "subject to influence by a payment from a developer substantially in excess of any amount that lawfully could have been imposed is fundamentally incompatible with the principles underlying the MLUL." *Id.* at 64–65, 66, 692 *A.*2d 966. "[A] developer's voluntary contribution to defray the cost of a municipal obligation, should not be permitted to influence or affect municipal zoning decisions." *Id.* at 66, 692 *A.*2d 966. He went on: "Our case law has been extremely sensitive to the threat presented by unlawful exactions imposed by a municipality on developers whether the developers are reluctant or enthusiastic participants in the transaction" and warned that "municipal officials must be scrupulously careful to avoid the imposition of conditions of approvals of development applications

that, even though acceptable to the applicants, could not be imposed without their consent." *Id.* at 67, 68, 692 *A.*2d 966.

Authorizing off-tract improvements beyond a developer's pro-rata share through the guise of "volunteerism" is problematic from many perspectives. At heart, it fails to provide an adequate safeguard against municipal duress to procure otherwise unlawful exactions because the line between true volunteerism and compulsion is a fragile one. *Nunziato v. Edgewater Planning Bd.,* 225 *N.J.Super.* 124, 133–34, 541 *A.*2d 1105 (App.Div.1988) ("Without legislated standards the possibilities for abuse in such negotiations between an applicant and a regulatory body, no matter how worthy the cause, are unlimited."); *Marlboro Twp. v. Holmdel Planning Bd.,* 279 *N.J.Super.* 638, 653 *A.*2d 1183 (App.Div.), *certif. denied,* 141 *N.J.* 98, 660 *A.*2d 1196 (1995) (admonishing illegal exactions as potential trade-offs for approval); Cox, *supra,* § 24–7.5 at 566 (noting "possible illegality of such extra-statutory exactions").

Indeed, it is hard to explain why a private developer would offer more than its fair share contribution without a *quid pro quo.* In addition to the problem of compulsion, so-called voluntary contributions are not much different than a pay-to-play system, where developers are rewarded for their "philanthropic" gifts. Allowing such a scheme not only impacts the developers willing to pay, but threatens the livelihood of those unable or unwilling to submit to the illicit exaction toll. Michael H. Crew, *Development Agreements After Nollan v. California Coastal Commission,* 22 *Urb. Law.* 23, 54–55 (1990) ("Permitting these excess exactions would in effect allow sale of development rights to those who are able to pay the asking price. . . . It would be fair to assume that . . . [the] zeal to increase revenue would result in inattention to more appropriate planning concerns.").

Most importantly, even if materially disproportional contractual exactions could be categorized as purely voluntary, they would be unenforceable insofar as they plainly violate the nexus and proportionality requirements in the MLUL that serve as the Legisla-

ture's check on a municipality's limited planning power. The exercise of that power must conform with the MLUL even if embodied in a contract; a developer and a municipality cannot do by contract what the statute prohibits. *Houston Petrol. Co. v. Auto. Prods. Credit Ass'n, Inc.*, 9 *N.J.* 122, 129, 87 *A.*2d 319 (1952) ("A municipality cannot act as an individual does. It must proceed in conformity with the statutes, or in the absence of statute agreeably to the common law, by ordinance or resolution or emotion. . . . Especially this is so where real property is concerned . . . ." (quoting *Anschelewitz v. Belmar*, 2 *N.J.* 178, 183, 65 *A.*2d 825 (1949))); *Twp. of Hopewell v. Gruchowski*, 29 *N.J.Super.* 605, 610, 103 *A.*2d 177 (Law Div.1954) ("The township may not do by indirection that which it cannot do by direction."). In short, the County cannot look to the developer's agreement to insulate it from a changed circumstances application. If the MLUL would bar the County from imposing full responsibility for the relocation of the Centerton Road/Creek Road intersection on Toll Brothers, the developer's agreement can have no contrary effect.

## VI

Alternatively, the County argues that, even if Toll Brothers is not barred from advancing a changed circumstances challenge to the conditions of approval, under *River Vale, supra,* which only applies where the approved project is entirely abandoned, its application would necessarily fail. Because Toll Brothers did not completely abandon its plans, the County maintains that there is no reason for a remand. Again, we disagree. Such a rule would have the effect of freezing a developer's off-tract obligations even if the lion's share of its project is scrapped. For example, under that theory, a developer whose 10,000 unit project was conditioned on the construction of a four-lane highway could be held fully responsible for the highway if the project was reduced to 100 units. Facially, that approach would offend the nexus and proportionality requirements reflected in the MLUL. It follows that a developer should be permitted to advance a material

change in circumstances, short of abandonment, as a basis for a declaration by the Board that the conditions, legitimate when originally imposed, have subsequently been rendered illegal. The relevant question is whether "a sufficient change" has occurred to merit reconsideration. *Russell, supra,* 31 *N.J.* at 66, 155 *A.*2d 83.

## VII

Finally, the County argues that Toll Brothers should be precluded from advancing a changed circumstances claim because the County relied to its detriment on what it considered the binding developer's agreement in its later dealings with other developers. Although not articulated as such, that argument is in the nature of a promissory estoppel claim. Promissory estoppel is made up of four elements: (1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment. *Lobiondo v. O'Callaghan,* 357 *N.J.Super.* 488, 499, 815 *A.*2d 1013 (App.Div.), *certif. denied,* 177 *N.J.* 224, 827 *A.*2d 291 (2003). Because, in these circumstances, the element of reasonable reliance must be tethered to the underlying authorizing resolution, and not to the developer's agreement, that argument too must fail.

Given the ancillary nature of a developer's agreement, the specific provisions of the MLUL for modification of the conditions of approval, and our deeply rooted jurisprudence regarding the right of a developer to seek modification based on changed circumstances, both Toll Brothers and the County knew or should have known that the conditions of approval were subject to change if the facts in the case changed and that the developer's agreement was not a stand-alone obligation. Indeed, the County's own acknowledgement that under *River Vale, supra,* a developer could be freed from the off-tract obligations in a developer's agreement if its project was abandoned proves the point. The County could not reasonably have relied on the developer's agreement as an immutable source of obligation by Toll Brothers in its dealings with other developers.

That is not to suggest that the County would be prohibited from advancing an equitable fraud argument based on *misrepresentations* by Toll Brothers. *First Am. Title Ins. Co. v. Lawson*, 177 *N.J.* 125, 136–37, 827 *A.*2d 230 (2003) ("In general, equitable fraud requires proof of (1) a material misrepresentation of a presently existing or past fact; (2) the maker's intent that the other party rely on it; and (3) detrimental reliance by the other party." (quoting *Liebling v. Garden State Indem.*, 337 *N.J.Super.* 447, 453, 767 *A.*2d 515 (App.Div.), *certif. denied*, 169 *N.J.* 606, 782 *A.*2d 424 (2001))). However, the County does not appear to be advancing that argument and, as the record presently exists, it is not supported. As far as we can tell, Toll Brothers agreed to be bound by the conditions so long as it was proceeding full-throttle with the original project and immediately sought relief when that project was radically reduced in scope. If that is not the case and there is proof that Toll Brothers continued to seek approvals and make promises that it never intended to keep, and, as a result, the County changed its position to its detriment, the County may have an equitable fraud claim.

## VIII

In denying Toll Brothers' motion to return to the Board, the trial judge was wide of the mark. That ruling was entirely a product of the notion that a developer's agreement is an independent obligation that frees the parties from the restraints in the MLUL. As we have said, that is not correct.

What is required therefore is a new proceeding before the County Planning Board at which Toll Brothers is given the opportunity to prove that, as circumstances now exist, the off-tract conditions of approval should be modified. Accordingly, we reverse the judgment of the Appellate Division to the contrary and return the matter to the trial judge who should resolve any outstanding legal issues and, in light of the age of this case, work with the parties to narrow and crystallize the questions to be presented for disposition by the Board.

At the hearing, Toll Brothers will bear the burden of proving that a change in circumstances has broken the nexus or rendered the contribution disproportionate. *Cf. Russell, supra,* 31 *N.J.* at 66, 155 *A.*2d 83 (holding applicant must present evidence sufficient to allow board to act); Cox, *supra,* § 27–7.1 at 608 ("The burden of proving the right to relief sought in the application rests at all times upon the applicant.").

To be sure, not every change in circumstances will require a recalculation. This case is about traffic. Thus, for example, as the County argues, if the reduction in the scope of Toll Brothers' development would have little or no effect on the original traffic projections in the Centerton Road area on which the conditions were based, no material change would be established and both the conditions and the developer's agreement would be enforceable. On the contrary, as Toll Brothers argues, if the traffic to be generated by its present project does not require the build out at Centerton Road or if Toll Brothers' "fair share" of the costs of the improvements is significantly less than what has been imposed, relief will be warranted.[3] Although the County argues that this record is a sufficient basis for the resolution of those issues, because Toll Brothers was denied the opportunity to present evidence including its updated traffic studies, the factual premises underlying the parties' arguments cannot be established without a remand.

Moreover, even if the County's view of the traffic issue prevails, the fact remains that Toll Brothers' overall project is only a fraction of what was on the drawing board when the conditions were originally imposed. Therefore, it is an open question whether, in light of that and of the principle that other developers should not enjoy a free ride at another developer's expense, the

---

[3] Despite some suggestion in the record that the initial conditions themselves exceeded Toll Brothers' fair share, there has never been a challenge to those conditions. Thus, like the parties, the Board may accept those conditions and the circumstances under which they were imposed as the valid starting point for its analysis.

ultimate cost to Toll Brothers is fair and equitable. That factual determination must be made by the Planning Board.

After the Board rules, either party may return to the trial judge for relief. In any subsequent action to review the Board's decision, the movant will have to overcome the presumption of validity of the planning action. *Riggs, supra,* 109 *N.J.* at 610–11, 538 *A.*2d 808 ("A zoning ordinance is insulated from attack by a presumption of validity, which may be overcome by a showing that the ordinance is 'clearly arbitrary, capricious or unreasonable, or plainly contrary to fundamental principles of zoning or the [zoning] statute.'" (quoting *Bow & Arrow Manor, Inc. v. Town of West Orange,* 63 *N.J.* 335, 343, 307 *A.*2d 563 (1973))).

Again, overarching all other issues will be the question of whether there is a sufficient nexus between the requirement that Toll Brothers relocate the Centerton Road/Creek Road intersection and the traffic needs created by the development in its present form and, if so, whether the ultimate cost to Toll Brothers is fair and equitable in light of present circumstances. That is what the MLUL requires.

## IX

To summarize, developer's agreements will continue to serve as valuable coordinating tools for long-term planning projects. However, such agreements must be entered into pursuant to a valid ordinance, and their terms must comport with fundamental zoning principles and relevant enabling legislation. One clear constraint in the MLUL is that a developer cannot be held responsible for paying more than its pro-rata share for off-tract improvements. That rule applies equally to conditions of approval and implementing developer's agreements. If the conditions are valid, the developer's agreement may be enforced. If not, the developer's agreement enjoys no independent status. A vital aspect of the planning process is the ability of developers to return to the planning board and present evidence that a sufficient change in circumstances exists to warrant a modification of previously im-

posed conditions. A developer's agreement is not an impediment to such a proceeding.

## X

The judgment of the Appellate Division is reversed. The matter is remanded to the trial judge for proceedings consistent with the principles to which we have adverted.

*For reversal and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE and RIVERA–SOTO—6.

*Opposed*—None.