**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1029-24

BOARD OF EDUCATION OF
THE CITY OF NEWARK,

    Plaintiff-Appellant,

v.

HOUSING AUTHORITY OF
THE CITY OF NEWARK, 33
MAPLE URBAN RENEWAL
LLC, THE FRIENDS OF TEAM
CHARTER SCHOOLS, INC.,
EQUITABLE FACILITIES FUND,
INC., EQUITABLE SCHOOL
REVOLVING FUND, INC.,
and U.S. BANK NATIONAL
ASSOCIATION,

    Defendants-Respondents.

_____

Argued March 24, 2026 – Decided June 10, 2026

Before Judges Gilson, Firko, and Vinci.

On appeal from the Superior Court of New Jersey, Chancery Division, Essex County, Docket No. C-000062-20.

Matthew J. Tharney and Brenda C. Liss argued the cause for appellant (Sattiraju & Tharney, LLP and Newark Board of Education, Office of the General Counsel, attorneys; Matthew J. Tharney and Brenda C. Liss, on the briefs).

Anthony R. Twardowski (Zarwin Baum DeVito Kaplan Schaer Toddy, PC) of the Pennsylvania bar, admitted pro hac vice and Thomas Owen Johnston argued the cause for respondents The Friends of Team Charter Schools, Inc., Equitable Facilities Fund, Inc., Equitable School Revolving Fund, LLC, and U.S. Bank National Association (Zarwin Baum DeVito Kaplan Schaer Toddy, PC, Johnston Law Firm, LLC, and Anthony R. Twardowski, attorneys; Chelsea P. Jasnoff and Thomas O. Johnston, on the brief).

PER CURIAM

Plaintiff the Board of Education of the City of Newark (the Board) sold twelve unused public-school properties to defendant the Housing Authority of the City of Newark (the Authority), with the plan that the properties would be used for housing, redevelopment, or economic development. The Authority thereafter sold one of the properties—33 Maple Avenue—to a developer. After spending over $4 million to clean up and renovate 33 Maple Avenue, the developer sold the property to defendant The Friends of Team Charter Schools, Inc. (FO Team) for $10 million. FO Team borrowed over $21 million to purchase and renovate the property and secured the loan with a mortgage on the

property.  Thereafter, FO Team leased 33 Maple Avenue to be used as a charter school.

The Board appeals from orders granting summary judgment to FO Team and the Authority and dismissing with prejudice its claims that the agreement with the Authority did not allow 33 Maple Avenue to be used as a charter school and that the Board had no right to recover title to 33 Maple Avenue through a reversion provision in its agreement with the Authority.  The Board also appeals from orders granting summary judgment to FO Team and awarding damages based on a theory of promissory estoppel and denying its cross-motion for summary judgment on the promissory estoppel claim.

Having reviewed the record and law, we hold the Authority did not breach its contract with the Board.  We also hold the Board had no right to recover title to 33 Maple Avenue.  Accordingly, we affirm the orders granting summary judgment to FO Team and the Authority and dismissing all the Board's claims. We also reverse the order granting summary judgment to FO Team on its counterclaim of promissory estoppel.  The material undisputed facts establish that the Board did not make a promise to FO Team and FO Team did not reasonably rely on the alleged promise by the Board.  Thus, we remand and

3

direct the trial court to enter an order granting summary judgment to the Board on the promissory estoppel claim.

I.

We summarize the relevant facts from the record, viewing them in the light most favorable to the Board, which was the party against whom summary judgment was granted. Samolyk v. Berthe, 251 N.J. 73, 78 (2022); Richter v. Oakland Bd. of Educ., 246 N.J. 507, 515 (2021). In doing so, we note that many of the material issues are resolved by a plain reading of the contract between the Board and the Authority.

For several years before 2016, the Newark School District (the District) was experiencing a budget crisis. Numerous school buildings owned by the Board were not being used, needed substantial repairs, and were incurring significant maintenance costs. The Board and Authority developed a plan to sell unused school properties so that they could be developed for other uses.

In February 2016, the Authority adopted resolution H-16-25-02-01 (Resolution H) authorizing an agreement with the Board to obtain twelve school properties and develop them to generate revenue for the Board and to create job opportunities for city residents. Resolution H references N.J.S.A. 18A:20-9, a statute that permits boards of education to convey unused school buildings so

4

that those buildings can be sold or developed for other uses. The statute also permits restrictions on the future uses of the buildings and provides that if a building is not used for the stated purposes, title can revert to the board of education. N.J.S.A. 18A:20-9.

On April 19, 2016, the Board and the Authority entered into a Site Disposition and Development Agreement (SDD Agreement). The SDD Agreement states that the Board would convey to the Authority for "nominal consideration" twelve "unproductive" public school "sites," with the plan that the sites would be redeveloped or sold. In that regard, the SDD Agreement described a "Sites Development Program" and defined it in a "WHEREAS" clause:

> WHEREAS, [the Board] and [the Authority] hereby intend to create a program whereby designated [Board] Sites throughout the City are conveyed to the [Authority] for purposes of alleviating unproductive sites from the [Board] balance sheet in order to create expense savings and generate revenue opportunities for [the Board], while also [] increasing tax ratables for the City of Newark (the "City") and enhancing job and employment opportunities for City residents (referred herein as the "Sites Development Program" or the "Program")[.]

The SSD Agreement also defined the "Purposes" of the conveyance of the school properties. Article 5.1 states, in relevant part:

The Sites are being transferred and conveyed to [the Authority] for purposes of effectuating the Site Development Program. It is anticipated that the Site Development Program will enable [the Board] to realize expense savings and generate revenue for capital improvements while also increasing tax ratables for the City and enhancing job and employment opportunities for City residents ("Purposes"). As such, under the Program [the Authority] shall accept conveyance of various Sites in accordance with the terms of this [SDD] Agreement, and shall utilize its experience, expertise and resources available to it in order to pursue development and housing opportunities for each Site conveyed to it.

The SDD Agreement also provided the Board with a right of reversion to the properties. In Article 5.2, the SDD Agreement states, in relevant part:

Any Sites conveyed to [the Authority] shall be subject to a right of reversion exercisable by [the Board], if and to the extent, [the Authority] has not developed a Site Project or demonstrable plans for such Site within three (3) years from the date of execution of this [SDD] Agreement. . . . This right of reversion shall not be included in any deed, or otherwise recordable document, from [the Board] to [the Authority] for any Site; and if requested by [the Authority] or any third[-]party developer, [the Board] shall execute and deliver a document to discharge this right of reversion.

Article 5.4 of the SDD Agreement described the Authority's obligation concerning developing a "Site Project" for each site. Section one of Article 5.4 states, in relevant part:

[The Authority] shall work diligently to investigate and identify feasible housing, redevelopment and economic development opportunities at each Site (each, a "Site Project"). [The Authority] shall solicit proposals for Site Projects and shall interview and negotiate with third[-]parties in an effort to develop realizable Site Projects consistent with the Purposes of the Program. In so doing, [the Authority] shall work with [the Authority's] professionals, as necessary, to perform site investigations, consider financing options, examine [a]pplicable [l]aws and State programs, and liaise with state and local governmental entities, as necessary. [The Authority] shall engage professionals to draft development and other agreements (each, a "Developer Agreement") necessary in order to realize each Site Project. A Developer Agreement for a Site Project shall set forth details of adequate Site Project finance, financial closing, construction, lease up, and other milestones and requirements in order to ensure that such Site Project can be completed in accordance with commercially reasonable standards and timeliness (collectively, "Performance Milestones").

Article 5.4(4) required City council approval for any developer agreement or disposition to a third-party developer.

The SDD Agreement also allowed the Authority to obtain a right of reversion to each site conveyed to a "third[-]party developer." Thus, section two of Article 5.4 states:

[The Authority] shall be authorized, subject to the requirements set forth in [s]ection 5.4(4) below, to dispose of a Site to a third[-]party developer for purposes of effectuating a Site Project. In connection therewith, each Developer Agreement that provides for

7

or contemplates disposition of a Site to a third[-]party developer shall provide for revisionary rights to [the Authority] in the event such Performance Milestones are not met.

Additionally, the SDD Agreement recognized that some sites might not be feasible for redevelopment. For those sites, the SDD Agreement states that they can be disposed of as "Unwanted Site(s)." Article 5.5(a) states in relevant part:

> In the event [the Authority] determines that it will not be able to generate a feasible Site Project at such Site(s) ("Unwanted Site(s)"). [The Board] and [the Authority] shall work collaboratively and collectively to dispose of the Unwanted Site(s) at minimum cost to [the Board] and no cost to [the Authority]. [The Board] and [the Authority] may consider the following options: a) [the Authority] may convey the Unwanted Site(s) to [the Board] conditioned upon acceptance of such conveyance by [the Board]; b) [the Board] and [the Authority] may agree to auction such Unwanted Site(s), with [the Board] bearing all costs of such auction; and c) any other avenues through which [the Authority] can dispose of such Unwanted Site(s) provided such avenues are agreed upon by both parties.

In accordance with the SDD Agreement, the Board conveyed twelve school properties to the Authority. One of the properties conveyed was a former school located at 33 Maple Avenue, also known as Block 3712, Lot 1 (33 Maple Avenue). In that regard, on June 30, 2016, the Board transferred title to 33

8

Maple Avenue to the Authority for $1.00. The transfer was made through a deed, which was thereafter recorded.

Several months later, in November 2016, the Authority issued a request for qualifications and proposal (RFQ/P) to develop 33 Maple Avenue and other sites that had been conveyed to the Authority. The RFQ/P explained: "The overarching objective of [the Authority] is to convey 100 % fee interest in the properties to third[-]party purchasers/developers for re-use and/or redevelopment pursuant to agreed upon performance milestones . . . ." The RFQ/P also stated that housing and commercial facilities were acceptable purposes for developing the properties and required potential developers to disclose whether they had ownership interest in a City charter school.

Just before issuing the RFQ/P, the Authority had 33 Maple Avenue appraised. The appraisal valued 33 Maple Avenue at $3.96 million. The appraisal, however, also noted: "This appraisal does not take into consideration any environmental concerns and assumes the subject property is remediated."

In September 2017, the superintendent of the District wrote to the Authority stating that city council approval was not necessary for the sale of any of the sites to third parties. The superintendent accordingly waived the

A-1029-24

requirement that the city council approve the sale of any site to a third party under Article 5.4(4) of the SDD Agreement.

Two months later, on November 16, 2017, the superintendent signed an affidavit of title representing that the Board had clear title to 33 Maple Avenue. The following month, on December 28, 2017, the Authority sold 33 Maple Avenue to 33 Maple, LLC (the LLC) for $1.2 million.[1]

The deed conveying 33 Maple Avenue to the LLC stated that it was "a Bargain and Sale Deed with Covenants as to Grantor's Acts." In that regard, the deed included the following language:

> Promise by Grantor. The Grantor promises that the Grantor has done no act to encumber the property. The promise is called a "covenant as to grantor's acts" (N.J.S.A. 46:4-6). The promise means that the Grantor has not allowed anyone else to obtain any legal rights which affect the property (such as by making a mortgage or allowing a judgment to be entered against the Grantor).
>
> This conveyance is made subject to all easements, covenants, restrictions and agreement of record; if any, zoning and ordinances, land use regulations and requirements of the City of Newark, and all facts that an accurate survey and physical inspection of the property may disclose.

---

[1] The LLC later changed its name to 33 Maple Urban Renewal, LLC. We use the LLC to refer to both entities.

Resolution H was attached to the deed, and the deed was recorded on January 11, 2018.

The LLC did not sign a Developer Agreement. About a year after the sale, in December of 2018, the Board received approximately $1.1 million from the net proceeds of the sale of 33 Maple Avenue to the LLC.

At the time that 33 Maple Avenue was sold in December 2017, the property was described to be in "poor" condition, and it was noted that the property would require major renovations. Following the sale, the LLC spent approximately $4.5 million on environmental remediation and renovations to 33 Maple Avenue.

In March 2020, the LLC sold 33 Maple Avenue to FO Team for $10 million. In the deed of sale, the LLC provided a "covenant as to the grantor's act (N.J.S.A. 46:4-6)." In that covenant, the LLC represented that it "has not allowed anyone else to obtain any legal right which would affect the property (such as by making a mortgage or allowing a judgment to be entered against the [LLC].)"

To finance the purchase and additional renovations to 33 Maple Avenue, FO Team borrowed $21.5 million from Equitable Facilities Fund, Inc. and gave the lender a mortgage on the property. Thereafter, the mortgage was assigned

11

to Equitable School Revolving Fund, Inc. and then to U.S. Bank National Association (collectively, the Lenders).

Beginning in 2021, FO Team leased 33 Maple Avenue to Team Academy Charter School, Inc. (Team). Team operates the KIPP Seek Academy at 33 Maple Avenue and the school provides education to approximately 540 students.

A month after the sale of 33 Maple Avenue to FO Team, the Board sued FO Team and the Authority. The Board claimed that using 33 Maple Avenue as a charter school was not permitted under the SDD Agreement. The Board also sought to recover title to 33 Maple Avenue by exercising its reversion rights under the SDD Agreement. Additionally, the Board named the LLC and the Lenders as defendants. At approximately the same time, the Board filed a notice of lis pendens against 33 Maple Avenue.

At the time the notice of lis pendens was filed, the Lenders had advanced just over $10.9 million to FO Team. Thereafter, the Lenders placed the remaining approximately $10.6 million of the loan in FO Team's construction account but refused to allow those monies to be used for renovation of 33 Maple Avenue. Consequently, FO Team arranged to borrow an additional $6.5 million from a different lender and FO Team thereafter used that loan to complete renovations at 33 Maple Avenue.

 A-1029-24

Defendants filed several motions to dismiss, which were denied. In May 2023, the Board filed a third amended complaint. In that complaint, the Board asserted seven causes of action: three counts of breach of contract (counts one through three); a violation of the covenant of good faith and fair dealing (count four); tortious interference with contract against the LLC and FO Team (count five); tortious interference with a prospective economic advantage against the LLC (count six); and unjust enrichment against the LLC (count seven). In connection with the breach of contract claims, the Board sought specific performance of its right of reversion and sought to recover title to 33 Maple Avenue. The Board also made claims for compensatory damages, punitive damages, attorneys' fees, and costs.

In January 2023, FO Team and the Authority moved for summary judgment.[2] In response, the Board cross-moved for partial summary judgment on its claim that the Authority had breached the SDD Agreement. On June 9,

_____

[2] The LLC and Lenders also moved for summary judgment. The LLC was eventually dismissed from the litigation, and no party is challenging that dismissal on this appeal. All parties concede that the claims against the Lenders are dependent on the claims against FO Team.

13

2023, the trial court denied all those motions, reasoning that there were material fact disputes.[3]

Several months later, FO team moved for reconsideration. By that time, a different judge (the second judge) had assumed responsibility for oversight of the litigation. The second judge heard argument on the motion for reconsideration on February 12, 2024. Initially, the judge stated that she would deny the motion and she scheduled a hearing on whether a charter school was a permitted use under the SDD Agreement.

On April 10, 2024, the second judge conducted a conference with counsel. At that conference, the judge announced that there was no need for an evidentiary hearing because she held, at best, the SDD Agreement was ambiguous as to whether a charter school was a "redevelopment," or "economic development" under the SDD Agreement. The judge then reasoned that an ambiguous use restriction could not, as a matter of law, bind FO Team as a subsequent purchaser of 33 Maple Avenue. In making that ruling, the second

---

[3] The trial court also barred the Board's expert from testifying concerning the value of 33 Maple Avenue. While the Board challenges that ruling on this appeal, given our affirmance of the dismissal of all the Board's claims, any issue concerning the expert is moot.

A-1029-24

judge also determined that the bargain and sale deeds and affidavit of title did not include language precluding using 33 Maple Avenue as a charter school.

Despite that ruling, the Board argued that it still had a right of reversion because 33 Maple Avenue had not been developed within the three-year provision of the SDD Agreement. On May 7, 2024, the second judge heard further arguments on the reversion claim. Two days later, on May 9, 2024, the judge placed an oral decision on the record. The second judge held that the Board had no right of reversion to 33 Maple Avenue.

On June 18, 2024, the second judge entered an order that (1) granted reconsideration of portions of the June 9, 2023 order denying summary judgment to FO Team and the Authority; (2) granted summary judgment to FO Team on the Board's claims asserted in counts one and five of the third amended complaint; (3) dismissed count two of the third amended complaint against FO Team as moot; and (4) granted summary judgment to the Authority on counts one and two of the third amended complaint. In that same order, the second judge directed the parties to move for summary judgment on the remaining claims, which included the Board's claim of breach of contract against the Authority and FO Team's counterclaim for promissory estoppel.

A-1029-24

The judge heard further arguments on those summary judgment motions on July 19, 2024. On October 29, 2024, the court entered three orders and explained the reasons for those orders on the record. In one order, the judge granted summary judgment to the Authority on the third count of the Board's third amended complaint and dismissed with prejudice the Board's claim of breach of contract against the Authority. In another order, the judge granted summary judgment to FO Team on its promissory estoppel counterclaim and awarded FO Team $768,487.05 in damages. Finally, in the third order, the judge denied the Board's cross-motion for summary judgment to dismiss FO Team's promissory estoppel claim.

The Board now appeals from the June 18, 2024 order and the October 29, 2024 orders.

II.

On appeal, the Board presents three main arguments. It contends that the trial court erred in (1) granting summary judgment to FO Team; (2) granting summary judgment to the Authority; and (3) granting summary judgment to FO Team on its promissory estoppel claim. The Board asserts that there are several issues of material fact disputes precluding summary judgment and that the second judge erred in her legal rulings.

16

A plain reading of the SDD Agreement established that there was no breach by the Authority. Moreover, the law is well-established that a right of reversion must be clearly stated and there was no clear right of reversion stating that the former public-school properties could not be used as charter schools. Because there was no breach, the trial court properly entered summary judgment in favor of FO Team and the Authority and dismissed all the Board's claims.

The material undisputed facts also establish the Board did not make a definitive promise to FO Team and FO Team did not reasonably rely on a promise. Accordingly, we reverse and vacate the October 29, 2024 order granting summary judgment to FO Team on its promissory estoppel claim and remand, directing the trial court to enter an order granting summary judgment to the Board and dismissing with prejudice FO Team's promissory estoppel counterclaim.

## III.

We review de novo orders granting summary judgment and apply the same standard that governed the trial court's rulings. Conley v. Guerrero, 228 N.J. 339, 346 (2017). Summary judgment will be granted if, viewing the evidence in the light most favorable to the non-moving party, "there is no genuine issue of material fact and 'the moving party is entitled to a judgment or order as a

matter of law.'" Ibid. (quoting Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016)); Samolyk, 251 N.J. at 78; R. 4:46-2(c).

Moreover, appellate courts review de novo a trial court's interpretation of contracts. Serico v. Rothberg, 234 N.J. 168, 178 (2018); JPC Merger Sub LLC v. Tricon Enters., Inc., 474 N.J. Super. 145, 159-60 (App. Div. 2022). "Accordingly, we pay no special deference to the trial court's interpretation and look at the contract with fresh eyes." JPC Merger Sub LLC, 474 N.J. Super. at 160 (quoting Kieffer v. Best Buy, 205 N.J. 213, 223 (2011)). In interpreting contracts, we look at the language used by the parties and construe the language consistent with its plain meaning, considering the overall purpose and meaning of the contracts. See In re County of Atlantic, 230 N.J. 237, 254 (2017). "Because '[t]he plain language of the contract is the cornerstone of the interpretative inquiry[,] "when the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result."'" JPC Merger Sub LLC, 474 N.J. Super. at 161 (alterations in original) (quoting Barila v. Bd. of Educ. of Cliffside Park, 241 N.J. 595, 616 (2020)).

A-1029-24

IV.

We begin our analysis by addressing the Board's affirmative claims against the Authority and FO Team. All the Board's affirmative claims depend on an interpretation of the SDD Agreement. Specifically, the claims depend on construing whether the SDD Agreement allowed the sites conveyed to the Authority to be used as charter schools. The Board's right of reversion is also dependent on construing the SDD Agreement and determining whether there is a clear and unambiguous restriction on using the former public-school properties as charter schools.

The SDD Agreement states that the properties conveyed by the Board to the Authority can be used for "housing, redevelopment and economic development opportunities." In other provisions of the SSD Agreement, it references "development" opportunities. First, in Article 5.1, the SDD Agreement defines the "Purposes" to include "development and housing opportunities for each Site conveyed to [the Authority]." In article 5.4(1), the SDD Agreement states: "[The Authority] shall work diligently to investigate and identify feasible housing, redevelopment and economic development opportunities at each Site (each, a 'Site Project')."

 A-1029-24

A plain reading of the terms "development," "redevelopment," and "economic development" does not preclude using the former Board properties as charter schools. See Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/development (last visited May 18, 2026) (defining "development" as "a tract of land that has been made available or usable: a developed tract of land," and "redevelopment" as "the act or process of redeveloping"); see also Black's Law Dictionary 566, 1532 (12th ed. 2024) (defining "development" as "[t]he conversion of land to a new purpose . . . a substantial human-created change to improved or unimproved real estate, including the construction of buildings or other structures" and "redevelopment" as "[r]ehabilitation of an urban-residential or commercial section that is subject to blight or in decline, [] by erecting new buildings or renovating the old ones"). Consequently, "development" and "redevelopment" are both broad terms, and when read in context of the entire SDD Agreement, those terms allow for any use of the former school properties which "enhance[ed] job and employment opportunities for City residents." More to the point, neither of those terms precludes developing the sites to be used as a charter school. Indeed, nowhere in the SDD Agreement does it state that charter schools are prohibited uses.

A-1029-24

To the extent the Board relies on the meaning of redevelopment as used in the redevelopment statute, N.J.S.A. 18A:20-9, we reject that argument. While Resolution H and the SSD Agreement refer to N.J.S.A. 18A:20-9, they do so in the context of the conveyance of the properties to the Authority. Nothing in the SSD Agreement states that a sale of the properties by the Authority to a third party is subject to N.J.S.A. 18A:20-9. Indeed, the Board expressly waived the Authority's obligation to seek approval of a sale from the City council.

Consequently, a plain reading of the SDD Agreement establishes that the Authority did not breach the SDD Agreement by selling 33 Maple Avenue to the LLC. It is undisputed that prior to the sale to the LLC, the Board, through the superintendent of the District, provided the Authority with an affidavit that it had a clear title to 33 Maple Avenue. Therefore, the material undisputed facts establish that the Board knew that the Authority planned to sell 33 Maple Avenue to a third party.

The sale then took place in December 2017, well within the three-year reversion period set forth in the SDD Agreement. After that sale, the Board received over $1 million in consideration for the sale. Importantly, the LLC did not execute a "Developer Agreement" with the Authority. Instead, the deed given to the LLC made it clear that it was receiving 33 Maple Avenue as its own

21

property and there is nothing in that deed restricting how the property was thereafter to be used.

A plain reading of the SDD Agreement also establishes that the Board's right of reversion ended with the sale to the LLC. The Board's right of reversion was limited. Specifically, the Board had a right of reversion against the Authority if, and only if, the Authority did "not develop[] a Site Project or demonstrable plans for such Site within three (3) years from the date of execution of this agreement." It is undisputed that the Authority sold 33 Maple Avenue to the LLC in December 2017. The sale was clearly a demonstrable plan for 33 Maple Avenue and was also well within the three-year period because the SDD Agreement was executed on April 19, 2016, and 33 Maple Avenue was sold to the LLC on December 28, 2017.

Moreover, as stated in Article 5.2 of the SSD Agreement, the Board's reversion rights were connected to a "Site Project," which might take some time to complete. No provision or language of the SSD Agreement stated that the Authority could not sell a property without a Site Project. Indeed, the RFQ/P stated: "The overarching objective of [the Authority] is to convey 100 % fee interest in the properties to third[-]party purchasers/developers for re-use and/or

A-1029-24

redevelopment pursuant to agreed upon performance milestones to place the properties back into productive commercial use."

The material undisputed facts also establish that the Board had no right of reversion against FO Team. FO Team did not directly purchase 33 Maple Avenue from the Authority. Instead, FO Team was a subsequent purchaser, and it purchased 33 Maple Avenue in March 2020, from the LLC. Importantly, the deed conveying 33 Maple Avenue to FO Team did not contain any restriction on the use of the property as a charter school.

The law is well established that a right of reversion needs to be clear and unambiguous. See Cooper River Plaza E. v. Briad Grp., 359 N.J. Super. 518, 529 (App. Div. 2003) (explaining "[a]n ambiguous restriction [in a deed] will not be enforced in equity so as to impair the alienability or use of property"); Hagaman v. Bd. of Educ. of Woodbridge Twp., 117 N.J. Super. 446, 453 (explaining "[l]anguage in an instrument which is alleged to create" a reversionary interest in property should be "strictly construed"); see also Lehigh Valley R.R. Co. v. Chapman, 35 N.J. 177, 188 (1961) (stating "[a] recognized rule of construction dictates that an instrument, when a choice exists, is to be construed against rather than in favor of forfeiture").

The deed given to the LLC was a bargain and sale deed, which stated that there were no encumbrances on the property. In turn, the LLC gave FO Team a bargain and sale deed, which iterated that there were no encumbrances on the property. Even if FO team had looked back at the SDD Agreement, there is no provision in that agreement that expressly precludes 33 Maple Avenue from being used as a charter school.

The trial court reasoned that, at best, the terms "redevelopment" and "economic development" were ambiguous as to whether they could be read to preclude using the property as a charter school. As we have already held, we do not see ambiguity. Nevertheless, we do agree, to the extent that there was any argument that those terms precluded using the property as a charter school, the terms were at best ambiguous as to the restriction. Therefore, as a matter of law, the restriction was unenforceable against FO Team. Hagaman, 117 N.J. Super. at 454 (refusing to recognize a reversionary right to property, where the deed contained "no words creating" such a right).

Having construed the SDD Agreement, the Board's arguments about notice of the SSD Agreement are not controlling. Even if FO Team had been given a copy of the SDD Agreement and told that it was part of the chain of title,

24

a plain reading of the SSD Agreement would not have put it on notice that 33 Maple Avenue could not be used as a charter school.

Given our construction of the SDD Agreement, counts one, two, and three of the Board's third amended complaint, all of which asserted breach of contract claims, were properly dismissed with prejudice. Count five of the Board's third amended complaint was also properly dismissed with prejudice. That count asserted a claim for tortious interference against FO Team. To establish tortious interference, a party must show: "(1) actual interference with a contract; (2) that the interference was inflicted intentionally by a defendant who is not a party to the contract; (3) that the interference was without justification; and (4) that the interference caused damages." Dello Russo v. Nagel, 358 N.J. Super. 254, 268 (App. Div. 2003). Because a plain reading of the SDD Agreement establishes that the Authority did not breach that agreement by allowing 33 Maple Avenue to be used as a charter school, FO Team could not have tortiously interfered with the SDD Agreement.

In its fourth count of the third amended complaint, the Board asserted a claim of violation of the convent of good faith and fair dealing against the Authority. The undisputed material facts establish that the Authority did not act inconsistently with its obligations under the SDD Agreement, nor did it act

A-1029-24

arbitrarily or in bad faith. Therefore, the Board had no claim for a violation of the covenant of good faith and fair dealing. See Wilmington Sav. Fund Soc'y, FSB v. Daw, 469 N.J. Super. 437, 452 (App. Div. 2021) (quoting Wilson v. Amerada Hess Corp., 168 N.J. 236, 251 (2001)). (explaining "[a] party breaches the implied covenant when it exercises its contractual functions 'arbitrarily, unreasonably, or capriciously' and with an 'improper motive'").

The sixth and seventh counts of the Board's third amended complaint asserted claims against the LLC. The Board dismissed all its claims against the LLC, and it has not and cannot challenge those dismissals on this appeal.

V.

Finally, we analyze the claim of promissory estoppel asserted by FO Team. To prevail on a promissory estoppel claim, a claimant must show: "(1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment." Goldfarb v. Solimine, 245 N.J. 326, 339-40 (2021) (quoting Toll Bros., Inc. v. Bd. of Chosen Freeholders of Burlington, 194 N.J. 223, 253 (2008)).

In terms of a definite promise, FO Team relies on the deed given by the Board to the Authority on November 16, 2017, which included a "covenant as to grantor's act." In that covenant, the Board represented that it had "not allowed

anyone else to obtain any legal rights which affect the property (such as by making a mortgage or allowing a judgment to be entered against the Grantor)." FO Team argues that the provision was a "clear and definite promise," and, as a subsequent purchaser, it was entitled to rely on the recorded promise when it acquired 33 Maple Avenue. FO Team then asserts it suffered damages when the Board violated its promise by placing a lien on the property, which caused its Lenders to stop releasing money to FO Team. The stopped loan releases, in turn, required FO Team to secure an additional $6.5 million from another lender to complete renovations at 33 Maple Avenue. FO Team's promissory estoppel claim fails for three reasons.

First, the promise in the deed was that the Board did not know of any other third-party claims against 33 Maple Avenue. The Board was not promising that it would not assert a claim under its agreements with the Authority. While we have now ruled that the Board has no reversionary right to 33 Maple Avenue and that the Authority did not breach the SSD Agreement, that interpretation of the SDD Agreement was not definitive in November 2017. More to the point, the Board did not state in the deed that it would not make any claims against the Authority or any subsequent purchaser of 33 Maple Avenue if it believed its rights under the SDD Agreement had been violated.

27

Second, the Board did not make a "clear and definite" promise to FO Team. FO Team was not a party to the deed executed between the Board and the Authority; rather it was a subsequent purchaser in the chain of title. There is no evidence showing the Board had any direct dealings with FO Team or that it gave a definitive promise to FO Team that 33 Maple Avenue could be used as a charter school.

Third, FO Team has not established reasonable detrimental reliance. FO Team claims it was damaged because its Lenders stopped releasing monies under a loan agreement and it had to secure a new loan. Following the close of discovery, however, FO Team did show why and under what provisions of the loan documents the Lenders took their actions. More importantly, FO Team has not established that the Lenders were acting only because of the lis pendens filed by the Board. Indeed, to the extent the Lenders relied on the lis pendens, that action reflects that the Lenders believed there was a legitimate basis for the Board's claims.

In short, the material undisputed facts establish the Board did not make a promise to FO Team and FO Team did not reasonably rely on a promise from the Board. Accordingly, we reverse and vacate the order granting summary judgement to FO Team on its promissory estoppel claim and remand with

28

direction that the trial court enter an order granting summary judgment to the Board and dismiss with prejudice the promissory estoppel claim.

Affirmed in part, reversed and vacated in part, and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division